## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1)** | **STATE FARM FIRE AND CASUALTY COMPANY, an Illinois Corporation,** | ) ) ) |
| | | ) |
| | **Plaintiff,** | ) |
| | | ) |
| **vs.** | | ) |
| | | ) |
| **(1)** | **SWEET APPETIT, INC., an Oklahoma Corporation;** | ) ) |
| | | ) |
| **(2)** | **LUDGER SCHULZ, and** | ) |
| | | ) |
| **(3)** | **SGN FOODS, LLC, an Oklahoma Limited Liability Company,** | ) ) ) |
| | | ) |
| | **Defendants.** | ) |

**Case No.  19-CV-630-CVE-JFJ**

## COMPLAINT FOR DECLARATORY JUDGMENT

**COMES NOW** Plaintiff, State Farm Fire and Casualty Company ("State Farm"), and hereby seeks declaratory judgment pursuant to 28 U.S.C. 2201 *et seq*., relating to the rights and liabilities of the parties under certain insurance policies as more fully set forth herein.

## I. JURISDICTION AND VENUE

1.      This declaratory judgment action arises from demands made by Defendants, Ludger Schulz ("Schulz") and Sweet Appetit, Inc. ("Sweet Appetit"), for State Farm to defend and indemnify them in relation to Case No. CJ-2019-662 filed in the District Court of Tulsa County, Oklahoma, and styled *SGN Foods, LLC v. Sweet Appetit, et al*.

1

("Underlying Action").

2.     Sweet Appetit is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma.

3.     Schulz is an Oklahoma resident and citizen residing in Tulsa County, Oklahoma.

4.     Defendant, SGN Foods, LLC ("SGN"), is a limited liability company organized under the laws of the State of Oklahoma, and having its principal place of business in Tulsa, Oklahoma.

5.     Plaintiff, State Farm, is incorporated and has its principal place of business in the State of Illinois.

6.     The insurance policies at issue in this declaratory judgment action consist the following two Businessowners Insurance Policies: (1) Policy Number 96-BL-R081-7, and (2) Policy Number 96-BS-E946-7 ("Policies"). Certified copies of the Policies are attached hereto, and incorporated herein, as follows:

**Policy Number 96-BL-R081-7**–Policy Period September 15, 2011–September 15, 2012 (Exhibit 1);

**Policy Number 96-BL-R081-7**–Policy Period September 15, 2012–September 15, 2013 (Exhibit 2);

**Policy Number 96-BL-R081-7**–Policy Period September 15, 2013–September 15, 2014 (Exhibit 3);

**Policy Number 96-BL-R081-7**–Policy Period September 15, 2014–September 15, 2015 (Exhibit 4);

**Policy Number 96-BL-R081-7**–Policy Period September 15, 2015–September 15, 2016 (Exhibit 5);

**Policy Number 96-BL-R081-7**–Policy Period September 15, 2016–September 15, 2017 (cancelled effective August 29, 2017) (Exhibit 6);

**Policy Number 96-BS-E946-7**–Policy Period August 29, 2017–August 29, 2018 (Exhibit 7);

**Policy Number 96-BS-E946-7**–Policy Period August 29, 2018–August 29, 2019 (Exhibit 8); and

**Policy Number 96-BS-E946-7**–Policy Period August 29, 2019–August 29, 2020  (Exhibit 9).

7.      Subject to their terms and conditions, the Policies provide Business Liability Coverage with limits of $1,000,000.00. The amount at issue in this action exceeds the amount for diversity jurisdiction pursuant to 28 U.S.C. § 1332 based on the policy limits and the damages SGN seeks to be recover from the insureds, Sweet Appetit and/or Schultz, in the Underlying Action. According to SGN, the damages sought in the Underlying action are "in an amount in excess of the amount required for diversity jurisdiction pursuant to Section 1332 of Title 28 of the United States Code." (Plaintiff's Second Amended Petition, Case No. CJ-2019-662, p. 20, ¶ 1, Exhibit 10).

8.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest and costs, and the action is between citizens of different states.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

## II. FACTS

**A.**   **The Sale of Ludger's Catering and Dining Room Business to SGN**

10.    In 2009, Schultz was the "principal owner and operator of The Black Forest Café, Inc." ("BFC") (Purchase and Sale Agreement, p. 3, ¶ (q), Exhibit 11).

11.    In 2009, the operations of BFC included a (1) "catering and private dining room establishment," operated under the trade name "Ludger's Catering & Dining Room,"and (2) a bakery operated under the trade names "Ludger's Cakes" and/or "Ludger's Bakery" and/or "Ludger's Bavarian Cakery." (Purchase and Sale Agreement, p. 3, ¶ 2.01, Exhibit 11; Declaration of Megan J. Sherrill ("DMS"), p. 1, ¶ 3, Exhibit 12).

12.    On October 29, 2009, Schultz, as President of BFC, entered into a Purchase and Sale Agreement which provided that the "Seller [BFC], desires to sell all of the Assets, Stock Inventory, and the business and goodwill of a portion of the business of Seller [BFC] doing business as (d/b/a) Ludger's Catering & Dining Room (hereinafter collectively referred to as 'Ludger's Catering')." (Purchase and Sale Agreement, p. 1, Exhibit 11) (brackets added).

13.    The cover page to the Purchase and Sale Agreement succinctly summarized the subject matter of the sell as follows:

PURCHASE AND SALE AGREEMENT FOR

THE ASSETS, INVENTORIES AND GOODWILL OF

LUDGER'S CATERING & DINING ROOM,

A PORTION OF THE BUSINESS OF

THE BLACK FOREST CAFÉ, INC.

BY

SGN FOODS, LLC"

(Purchase and Sale Agreement, Cover Page, Exhibit 11).

14.     The Purchase and Sale Agreement defined the term "Seller" as follows:

"'Seller' means the Black Forest Café, Inc., including its owners, directors, members,

officers, managers, employees, and it (sic) successors and assigns." (Purchase and Sale

Agreement, p. 3, ¶ (r), Exhibit 11).

15.     At the time of the sale, Schultz was an owner, director, officer, and employee

of BFC. Shultz signed the Purchase and Sale Agreement as "President" of BFC. (Purchase

and Sale Agreement, p. 11, Exhibit 11).

16.     The Purchase and Sale Agreement defined the portion of the business sold as

"Ludger's Catering." Specifically, the Agreement set forth the following definition:

(l)     "'Ludger's Catering' means the Assets, Stock Inventory, and the
        business and good will of that portion of the business of Seller doing
        business as (d/b/a) Ludger's Catering and Dining Room located at
        6120-A East 32nd Place, Tulsa, OK 74135, but specifically excluding
        that other certain portion of the business of Seller doing business as
        (d/b/a) 'Ludger's Cakes.'"

(Purchase and Sale Agreement, p. 2, ¶ (l), Exhibit 11).

17.     The "TERMS OF SALE & CONDITIONS PRECEDENT" section of the

Purchase and Sale Agreement provides that BFC was selling, and SGN was buying, "**the**

5

**right to operate in perpetuity and exclusively the catering and private dining room establishment of Ludger's Catering.**" Specifically, the Purchase and Sale Agreement provides as follows:

**ARTICLE 2**. TERMS OF SALE & CONDITIONS PRECEDENT

2.01.   Subject to the terms and conditions of this Agreement, Seller [BFC] shall sell, convey, transfer and assign and deliver to the Buyer [SGN] all of the Assets and the right to operate in perpetuity and exclusively the catering and private dining room establishment of Ludger's Catering, insofar as permitted by state, county and city law, for the total sum of Three Hundred Thirty-five Thousand Dollars ($335,000.00) paid to Seller (the "Purchase Price") as set forth below:

(a)   For the Assets of Ludger's Catering, Buyer shall pay the total sum of Sixty Thousand Dollars ($60,000.00), in cash or by certified check at the Closing; and

(b)   For the goodwill of the business, including the covenant not to compete in Section 2.06, and any and all trade marks, trade dress, contracts, licenses, and the exclusive right to continue operations of that portion of the business of Seller using the name "Ludger's Catering & Dining Room", and the right to link to the website (www.ludgers.com), all of the foregoing are intended to continue in perpetuity, Buyer shall pay the sum of Two Hundred Seventy Five Thousand Dollars ($275,000.00), subject to the terms of:

(1)   this Agreement;

(2)   the Promissory Note; and

(3)   the License Agreement.

(Purchase and Sale Agreement, p. 3, ¶ 2.01, Exhibit 11).

18.   In addition to signing the Purchase and Sale Agreement as President of BFC,

6

Schultz signed the Purchase and Sale Agreement as "an individual signatory solely for purposes of assuming the obligations of the non-compete provision of Section 2.06 herein." (Purchase and Sale Agreement, pp. 1, 11, Exhibit 11).

19.     The non-compete provision set forth in the Purchase and Sale Agreement provides in relevant part as follows: "Except as provided herein, each of Seller and Schulz understands, acknowledges and covenants that neither Seller nor Schulz shall own, operate, manage, or consult, directly or indirectly, in a business that competes with Ludger's Catering." (Purchase and Sale Agreement, p. 4, ¶ 2.06, Exhibit 11).

20.     The Purchase and Sale transaction included a Licensing Agreement. The Licensing Agreement provided that the "Licensor [BFC] has filed to register ownership of all right, title and interest to the Tradename, 'Ludger's Catering and Dining Room, (hereinafter, 'Licensor Mark') ...." (Licensing Agreement, p. 1, Exhibit 13).

21.     The "Licensor Mark" identified in the Licensing Agreement is "Ludger's Catering and Dining Room." (Licensing Agreement, p. 1, Exhibit 13).

22.     The Licensing Agreement provides that the "Licensee [SGN], desires to enter into this Agreement in conjunction with certain Purchase & Sale Agreement dated October 29, 2009, (the 'Purchase Agreement') for the assets and goodwill of that portion of the business of Licensor that has been utilizing the Licensor Mark and engaged in offering to the public the services of catering in conjunction with offering a private dining room for catered functions." (Licensing Agreement, p. 1, Exhibit 13).

7

23.    The Licensing Agreement provides that "Licensor [BFC] hereby grants to Licensee [SGN] under Licensor's rights in and to the Licensor Mark, an exclusive, fully paid up license, for a primary term of five (5) years beginning the date of Closing of the Purchase Agreement (the 'Primary Term')." (Licensing Agreement, p. 1, Exhibit 13).

24.    The Licensing Agreement provides that "During the Primary Term, the Licensor Mark shall be used in connection with marketing or services offered and related to catering and private dining room, and ownership of the Licensor Mark shall remain vested in the Licensor but subject to this Agreement." (Licensing Agreement, p. 1, Exhibit 13).

25.    The Licensing Agreement provides that at the end of the five year Primary Term, the Licensee, SGN, would be granted all rights to the "Licensor Mark [Ludger's Catering and Dining Room] ... exclusively in perpetuity." Specifically, the Licensing Agreement provides as follows:

> 4.  If at the end of the Primary Term the Licensee is not in breach of this Agreement and Licensee is not in an Event of Default under the Purchase Agreement, the Promissory Note, Security Agreement and Lease Agreement referenced herein, all of Licensor's rights, title and ownership in and to the Licensor Mark shall be transferred to the Licensee to have and to hold exclusively in perpetuity, except as expressly provided in Paragraph 9 herein.

(Licensing Agreement, p. 1, Exhibit 13).

26.    At no time prior to the expiration of the Primary Term of the Purchase and Sale Agreement did BFC advise SGN that it was in breach and/or in default of the Licensing or Purchase and Sale Agreements.

**B.**   **SGN's Catering Allegations**

27.   Within one year of the date in which the Purchase and Sale Agreement was executed, Shultz, as President of BFC, transferred the trade name "Ludger's Cakes" to Sweet Appetit, Inc. (Transfer of Trade Name Report, 9-9-2010, Exhibit 14).

28.   Upon information and belief, Sweet Appetit, Inc. ("Sweet Appetit), is a corporation owned and operated by Schultz.

29.   In addition to operating under the trade name "Ludger's Cakes," Sweet Appetit operated under the trade name "Ludger's Bavarian Cakery."

30.   Megan J. Sherrill is the manager of SGN. (DMS, p. 1, ¶ 1, Exhibit 12).

31.   Sherrill alleges that "[o]n or about April 8, 2015, [she] became aware that Sweet Appetit was offering catering services in connection with the promotion and sale of its Ludger's Bavarian Cakery services, catering services that directly competed with LUDGER'S CATERING." (DMS, p. 2, ¶ 7, Exhibit 12).

32.   On April 14, 2014, Sherrill sent an email to Allison Dickens of Sweet Appetit advising her that Sweet Appetit's offering of catering services competed with Ludger's Catering. According to Ms. Sherrill, she made known to Sweet Appetit that it was "SGN's position ... that Ludger's Bavarian Cakery was offering catering services in violation of SGN's exclusive and perpetual right to provide catering services associated with the Ludger's Catering trade names." (DMS, p. 2-3, ¶ 7, Exhibit 12).

33.   In her email to Dickens of April 14, 2014, Sherrill "specifically raised concerns

9

about the use of a 'Catering Menu' on the Ludger's Bavarian Cakery website and requested

that Sweet Appetit refrain from providing catering services and cease advertising therefor."

(DMS, p. 3, ¶ 7, Exhibit 12).

34.    By email dated April 15, 2015, Sweet Appetit, through Dickens, acknowledged

that they had filled two catering orders from Walgreens. Specifically, Dickens' email stated

as follows:

> I understand why the Walgreens situation would be upsetting. I wish you
> would have let me know what the root cause was in the beginning and we
> could have addressed that instead of going through all of this which has been
> emotionally draining. We would never have intentionally infringed on one of
> your clients. We have only helped them twice ... once last week and once in
> Oct. of 2014. I say that simply as clarification so you understand it was not
> solicited and it hasn't been a recurring thing. She simply called and ordered
> from our front counter.
>
> I am happy to address the confusion with the person who ordered it however
> you want me to.
>
> This is the very reason we haven't 'pushed' our breakfast trays ... because
> many of the suggested targets would be to advertise to pharmaceutical reps and
> other types of clientele that we know are a core part of your business.
> Typically our trays are ordered for groups here in our store. We rarely deliver
> them.

(Email, Allison Dickens to Megan Sherrill, 4-15-2015, Exhibit 15; DMS, p. 3, ¶ 8, 12).

35.    According to Sherrill, "[i]n late 2018, [she] became aware that Sweet Appetit

was again offering catering services in connection with the promotion and sale of its

Ludger's Bavarian Cakery services which had moved to 6527 E. 91st Street in Tulsa,

Oklahoma." (DMS, p. 3, ¶ 8, Exhibit 12).

36.     In 2018, Sweet Appetit, through operations under its trade name Ludger's Bavarian Cakery, offered a "CATERING MENU." The Catering Menu offered "Breakfast Bundles" and "Lunch Bundles." (Ludger's Bavarian Cakery Website Menu, 11-30-2018, Exhibit 16; DMS, p. 3, ¶ 9, Exhibit 12).

37.     According to Sherrill, "[a]s late as November 30, 2018, the Ludger's Bavarian Cakery website offered a 'Catering Menu' consisting of 'Breakfast Bundles' and 'Lunch Bundles' that directly infringed upon SGN's exclusive and perpetual right to operate the 'catering and private dining room establishment of Ludger's Catering.'" (DMS, p. 3, ¶ 9, Exhibit 12).

38.     On December 7, 2018, counsel for SGN sent a cease and desist letter to Sweet Appetit directed to BFC, Schulz, and Dickens. In the letter, SGN demanded that Sweet Appetit "cease providing and advertising catering services in connection with the Ludger's Bavarian Cakery business as it is infringing upon SGN's exclusive and perpetual right to operate LUDGER'S CATERING." (Cease and Desist Letter, 12-7-2018, p. 2, Exhibit 17; DMS, p. 4, ¶ 10, Exhibit 12).

39.     According to Sherrill, after Sweet Appetit received the cease and desist letter, and as of February 13, 2019, "[t]he current version of the Ludger's Bavarian Cakery website offers the exact same 'Breakfast Bundles' and 'Lunch Bundles' and simply changed the designation of these items from the 'Catering Menu' to the 'Breakfast & Lunch Bundles Menu.'" (DMS, p. 4, ¶ 12, Exhibit 12).

11

40.     SGN contends that it "has suffered significant damage as a result of Sweet Appetit's improper provision of catering in the form of loss of catering customers, confusion among existing catering customers, and damage to the goodwill that SGN has built in the LUDGER'S CATERING trade names," and that "[s]ince SGN's December 7, 2018 Cease and Desist Letter, there has been significant confusion among potential SGN customers, including South Tulsa Pediatrics, who mistakenly attempted to use the Ludger's Bavarian Cakery website menu to place a luncheon order with LUDGER'S CATERING." (DMS, p. 5, ¶ 13, Exhibit 12).

41.     According to Sherrill, as of February 13, 2019, "[d]espite SGN's repeated demands therefore, Sweet Appetit continues to provide and advertise catering services in direct competition with SGN which continues to create significant confusion among customers of SGN and the community at large," and she is "aware that as recently as February 12, 2019, Sweet Appetit provided catering services to a group of more than sixty (60) persons at a Tulsa Regional Chamber Luncheon event held at the Tulsa Historical Society." (DMS, p. 5, ¶ 14, Exhibit 12).

## C.     The Underlying Action Brought by SGN Against Sweet Appetit and Shultz

42.     On February 14, 2019, SGN filed the Underlying Action (Case No. CJ-2019-662) against Sweet Appetit in the District Court of Tulsa County, Oklahoma. (Plaintiff's Original Petition, Exhibit 18).

43.     In its Original Petition, SGN asserted the following two claims against Sweet

Appetit: (1) "Count I (Tortious Interference with Existing and Prospective Business Relationships)," and (2) "Count II (Violation of Oklahoma Deceptive Trade Practices Act, 78 Okla. Stat. § 51 *et seq*.)" (Original Petition, pp. 7-9, Exhibit 18).

44.     Also on February 14, 2019, SGN filed in the Underlying Action a Motion for Temporary and Permanent Injunction requesting "that the Court grant a temporary injunction ... barring Defendant Sweet Appetit from continuing to offer catering services and advertising therefor in connection with Ludger's Bavarian Cakery." (Plaintiff's Motion for Temporary and Permanent Injunction, p. 8, ¶ 22, Exhibit 19). SGN also sought "a permanent injunction barring Defendant Sweet Appetit from offering services and advertising therefor in connection with Ludger's Bavarian Cakery." (Plaintiff's Motion for Temporary and Permanent Injunction, pp. 9-10, ¶ 28, Exhibit 19).

45.     An evidentiary hearing on SGN's Motion for Temporary Injunction was held in the Underlying Action on March 27th and 28th, 2019. (Order Granting Plaintiff's Motion for Temporary Injunction, Exhibit 20).

46.     On April 17, 2019, the Court entered an Order Granting SGN's Motion for Temporary Injunction. In its Order, the Court made the following findings:

1.)     The Plaintiff [SGN] executed a Purchase and Sale Agreement ("Agreement") on about October 29, 2019 with The Black Forest Café, Inc. ("Black Forest") (a corporation whose President was Ludger Schulz. Mr. Schulz executed the agreement on behalf of the seller – Black Forest).

2.)     Pursuant to the terms of the Agreement, specifically Article 2, Section 2.01, the Plaintiff purchased from Black Forest "the right to operate in perpetuity and exclusively the catering and private dining room establishment

13

of Ludger's Catering." Black Forest sold this "exclusive right", Ludger's goodwill, trademarks and a covenant not to compete for $275,000.00 to the Plaintiff. <u>Agreement</u>, Article 2, Section 2.01 (b).

3.)     The Agreement defined "Ludger's Catering" as:

        ...Assets, Stock Inventory, and the business and goodwill of that portion of the business of seller doing business as (d/b/a) Ludger's Catering and Dining Room located at 6120 – A East 32nd Place, Tulsa, OK  74135, but <u>specifically excluding that other portion of the business of Seller doing business as (d/b/a) "Ludger's Cakes."</u>

(Emphasis added). <u>Agreement</u>, Article 1, Section 1.01 (1). The Court notes that the goodwill associated with the name "Ludger's" is and was significant.

4.)     The Agreement provided no definition of Seller's business identified as "Ludger's Cakes" except Section 1.01 (q) defines "Schulz" as "Ludger Schulz", "an individual and principal owner and operator of The Black Forest Café, Inc., and the business unit of Ludger's Cakes and/or Ludger's Bakery."

5.)     The distinction between Ludger's Catering and Ludger's Cakes and/or Ludger's Bakery, specifically what Ludger Schulz excluded from his sale to the Plaintiff and retained for himself, is best described in the Agreement in wording found in the original (now expired) but still instructive non-compete provision, Section 2.07.  That section of the Agreement placed a non-compete obligation on the Plaintiff as to Black Forest – that Plaintiff could "not own, operate, ...a business that competed with seller's Bavarian cream cake or wedding cakes within fifty (50) miles..." Section 2.07 also reserved to the Plaintiff the right to create, bake or sell any "bakery goods or dessert products not specifically retained by the Seller herein."

        The distinction is also reflected in Exhibit "C" to the Agreement which details "sign criteria." Included in Exhibit "C" is a statement that the "parties hereto have agreed that existing signage will be changed if necessary to clearly demonstrate the separateness of the business operations of Ludger's Catering and Dining Room from Ludger's Cakes.

6.)     Testimony from Defendant's witness Allison Dickens established that the Defendant acquired Ludger's cake business in 2010, and opened a new location in 2013. Ludger's cakes is best known for its "Bavarian Cream

14

Cheesecake". The new location included a coffee shop. At approximately the same time, the Defendant started offering savory items including a popular breakfast sandwich. However, the primary business of Ludger's cakes is in providing Danish, muffins, strudels and similar items.

7.)    In April 2015, the Plaintiff became aware that the Defendant was providing a "Catering Menu." The Plaintiff and Defendant exchanged a number of emails between April 8, 2015 and April 15, 2015 regarding the Plaintiff's assertion that the Defendant was catering and also concerns about the Defendant even offering savory items at all. Defendant acknowledged providing catering services to Walgreens during that time period on a few occasions and also acknowledged that their website was "confusing."

8.)    In late November, 2018, the Plaintiff again became aware that Defendant was offering a "Catering Menu". A cease and desist letter immediately followed. As of December 10, 2018, according to the testimony of Plaintiff's witness Megan Sherrill, the Defendant removed the words "Catering Menu" from its website but were still engaged in catering through offering breakfast and lunch bundles for large numbers. It appears the food services being provided were identical as those food services which previously had the heading "Catering Menu" and the current menu is headed "Breakfast" and "Lunch" "Bundles".

10.)    The Defendant engaged in catering services to the Tulsa Regional Chamber on February 12, 2019.

11.)    As a matter of law, the Court concludes that the language of the Agreement is clear as to what Ludger Schulz was selling to the Plaintiff in 2009 when he sold Ludger's Catering (and Dining Room). The Court further concludes that the Agreement is clear as to what Ludger Schulz was reserving for himself as a "business unit." Ludger Schulz sold, for a substantial sum, the goodwill of the Ludger's Catering name, and the exclusive and perpetual right to operate Ludger's Catering. The language of the Agreement in this regard is clear and explicit, and as such, controls the interpretation of Section 2.01 of the Agreement. See title 15 O.S.2011, §§ 154, 155.

In interpreting a contract, the "whole of a contract is to be taken together, so as to give effect to every part ... each clause helping the interpret others." 15 O.S. 2011, § 157. Certainly, when taken as a whole, the Agreement is clear and explicit as to the "business units" Ludger Schulz was reserving

15

when he sold Ludger's Catering to the Plaintiff, i.e., Ludger's Cakes, Ludger's Bakery, including but not limited to, Bavarian cream cheese cakes and wedding cakes. The foregoing clearly reflects the mutual intention of the parties to the Agreement.

12.)    The plain and ordinary meaning of the word "catering" can be found in its standard dictionary definition. Oxford English/Living Dictionaries defines catering as "the provision of food and drink at a social event or other gathering; Collins English Dictionary defines catering as "the activity of providing food and drink for a large number of people, for example, at weddings and parties; Cambridge Dictionary defines catering is (sic) the business of providing food and drink at events, for organizations.

While these definitions clearly define event-type catering, the question would remain as to the Defendant's breakfast and lunch bundles. Based on the foregoing definitions, if Defendant was to deliver its bundles, under the Ludger's name, to a remote event, it would be catering under the Ludger's name, regardless of any combination of words other than catering, such as cakery, bakery.

13.) The evidence is clear that even the Defendant recognized per the 2015 email communications with the Plaintiff that it did not "push" its breakfast trays "because many of the suggested targets would be to advertise to pharmaceutical  reps and other types of clientele that we know are a core part of your business."

The Defendant recognizes that this type of food service, providing meals, in essence, to large numbers of persons, even for pick up, as catering activity which, under the Ludger's name lies exclusively with Plaintiff. In contrast, providing bakery items, and even savory items, in house, to usual numbers of persons, would not be a catering activity.

(Order Granting Plaintiff's Motion for Temporary Injunction, 4-17-2019, ¶¶ 1-13, Exhibit

20).

47.    On May 29, 2019, SGN filed a Second Amended Petition ("SAP") in the

Underlying Action. In its SAP, SGN added as Defendants, The Black Forest Café,

Inc.("BFC"), and Ludger Schulz. (SAP, Exhibit 10).

48.     In its SAP, SGN alleges that "[o]n or about November 17, 2009, SGN acquired LUDGER'S Catering & Dining Room from Black Forest by virtue of a Purchase and Sale Agreement." (SAP, p. 2, ¶ 6, Exhibit 10).

49.     In its SAP, SGN alleges that "[a]s part of the Agreement, Black Forest conveyed to SGN 'the right to operate in perpetuity and exclusively the catering and private dining room establishment of LUDGER'S Catering' for a substantial sum of money." (SAP, p. 2, ¶ 7).

50.     In its SAP, SGN alleges that "[t]he bulk of the purchase price was allocated to the 'goodwill of the business, including ... any and all trademarks, trade dress, ... and the exclusive right to continue operations of that portion of the business ... using the name 'LUDGER'S Catering & Dining Room,' and the right to link to the website (www.ludgers.com), all of the foregoing were intended to continue in perpetuity ...." (SAP, p. 2, ¶ 8, Exhibit 10).

51.     In its SAP, SGN alleges that "[t]he Agreement included a Licensing Agreement which granted SGN the trade name 'LUDGER'S Catering and Dining Room' exclusively in perpetuity with the purpose of 'offering to the public the services of catering in conjunction with a private dining room for catered functions.'" (SAP, pp. 2-3, ¶ 9).

52.     After consummating the Purchase and Sale Agreement, BFC transferred the trade name "LUDGER'S Catering and Dining Room" to SGN. (SAP, p. 3, ¶ 12, Exhibit 10;

Transfer of Trade Name Report, 10-25-2009, Exhibit 21).

53.    In October 2014, SGN registered the "LUDGER'S Catering and Events" trade name with the Oklahoma Secretary of State. (SAP, p. 3, ¶ 14, Exhibit 10; DMS, p. 2, ¶ 4, Exhibit 12).

54.    In its SAP, SGN alleges that '[o]n or about April 8, 2015, SGN became aware that Sweet Appetit's LUDGER'S Bavarian Cakery was offering catering services in addition to its previously established cake and bakery business." (SAP, p. 4, ¶ 19, Exhibit 10).

55.    In its SAP, SGN alleges that "[i]n April 2015, SGN specifically identified the 'Catering Menu' on Sweet Appetit's LUDGER'S Bavarian Cakery website as a source of concern and demanded that it refrain from providing catering services and cease advertising thereof." (SAP, pp. 4-5, ¶ 22, Exhibit 10).

56.    In its SAP, SGN alleges that "Sweet Appetit acknowledged that they had filled two (2) catering orders from Walgreens but noted '[w]e would never have intentionally infringed on one of your clients.'" (SAP, p. 5, ¶ 23, Exhibit 10).

57.    In its SAP, SGN alleges that "[i]n the late fall of 2018, SGN became aware that Sweet Appetit's LUDGER'S Bavarian Cakery was again advertising and offering catering services at its new location at 6527 E. 91st Street in Tulsa, Oklahoma." (SAP, p. 6, ¶ 29, Exhibit 10).

58.    In its SAP, SGN alleges that "[i]n late November 2018, Sweet Appetit's LUDGER'S Bavarian Cakery website contained a 'Catering' Menu listing 'Breakfast

Bundles' and 'Lunch Bundles' with the 'LUDGER'S' name repeatedly displayed." (SAP, ¶ 30, Exhibit 10).

59.     In its SAP, SGN alleges that "Sweet Appetit's offering of catering services, in association with the 'LUDGER'S' name, infringe upon SGN's exclusive and perpetual right to operate the 'catering and private dining room establishment of LUDGER'S Catering." (SAP, p. 6, ¶ 32, Exhibit 10).

60.     In December 2018, SGN issued a "Cease and Desist" letter to Schulz and Sweet Appetit. The letter demanded that Schulz and Sweet Appetit "cease providing and advertising catering services in connection with the Ludger's Bavarian Cakery business as it is infringing upon SGN's exclusive and perpetual right to operate LUDGER'S CATERING." (Cease and Desist Letter, Exhibit 17; SAP, p. 6-7, ¶ 33, Exhibit 10).

61.     In its SAP, SGN alleges that "[a]s of December 2018, Sweet Appetit's 'LUDGER'S Bavarian Cakery' website offered and advertised the exact same 'Breakfast Bundles' and 'Lunch Bundles' as displayed on November 30, 2018. The only substantive difference was the descriptor of a 'Catering' before 'Menu' was changed to 'Breakfast & Lunch Bundles' before 'Menu.'" (SAP, p. 8, ¶ 42, Exhibit 10).

62.     In its SAP, SGN alleges that "[r]egardless of the change in the descriptor, Sweet Appetit's 'LUDGER'S Breakfast & Lunch Bundles Menu is a catering service in direct competition with SGN's exclusive right." (SAP, p. 9, ¶ 43, Exhibit 10).

63.     In its SAP, SGN alleges that "Sweet Appetit's ordering form for the

19

'LUDGER'S' Breakfast & Lunch Bundles Menu continued to expressly advertise 'catering.'" (SAP, p. 9, ¶ 44, Exhibit 10).

64.    In its SAP, SGN alleges that "[a]s recently as February 12, 2019, Sweet Appetit provided catering services to a group of more than sixty (60) persons at a Tulsa Regional Chamber Luncheon event held at the Tulsa Historical Society." (SAP, p. 10, ¶ 52, Exhibit 10).

65.    On March 12, 2019, Schultz, in his individual capacity, registered with the Oklahoma Secretary of State, the trade name of "LUDGER'S CATERING." (Secretary of State Trade Name Report, 3-12-2019, Exhibit 22; SAP, p. 10, ¶ 53, Exhibit 10).

66.    In its SAP, SGN alleges that "[a]t the March 27, 2019 hearing on SGN's Motion for Temporary and Permanent Injunction, L. Schultz testified he never intended to transfer the exclusive and perpetual right to operate a catering business associated with LUDGER'S name." (SAP, p. 10, ¶ 55, Exhibit 10).

67.    In its SAP, SGN alleges that "Schulz['s] testimony is contrary to the terms and conditions of the Agreement. These statements establish L. Schulz and Black Forest made material misrepresentations and acted with deceptive intent upon which SGN relied to its detriment." (SAP, p. 11, ¶ 57, Exhibit 10).

68.    In its SAP, SGN alleges that "[b]y registering 'LUDGER'S CATERING' and engaging in catering services, L. Schulz actively engaged in deceptive practices to dilute, harm, and compete with SGN's LUDGER'S catering business." (SAP, p. 11, ¶ 60, Exhibit

20

10).

69.     In its SAP, SGN alleges that "[a]s a result of Defendants' actions, SGN has suffered significant damages including the loss of customers and damages to SGN's goodwill built-up since late 2009," and "[t]he Defendants have interfered with SGN's prospective economic advantage by offering and advertising competing catering services and products in an effort to divert potential SGN catering customers to their business." (SAP, p. 13, ¶ 71, Exhibit 10).

70.     In its SAP, SGN seeks to recover from Sweet Appetit and Schulz under the following Counts:

- Count I–Tortious Interference with Existing and Prospective Business Relationships;

- Count II–Violation of Oklahoma Deceptive Trade Practice Act; and

- Count III–Permanent Injunction.

(SAP, pp. 13-16, Exhibit 10).

71.     In its SAP, SGN seeks to recover from Schulz under the following additional Counts:

- Count IV–Intentional Deceit, Fraud, Fraudulent Inducement and False Representations;

- Count V–Intentional Non-Disclosure or Concealment of a Material Fact; and

- Count VI–Wrongful Interference with Property.

(SAP, pp. 16-21, Exhibit 10).

72.     Under Count I–Tortious Interference with Existing and Prospective Business Relationships, SGN seeks the following damages: "SGN seeks an accounting from the Defendants of all income from catering services received since September 9, 2010. SGN further requests that the Court order the Defendants to disgorge all profits received from offering catering since September 9, 2010." (SAP, p. 14, ¶ 80, Exhibit 10).

73.     Under Count II–Violation of Oklahoma Deceptive Trade Practice Act, 78 Okla. Stat. tit. 51, *et seq*. SGN seeks the following damages: "an award of damages authorized by 78 Okla. Stat. § 54 for damage to SGN's reputation and loss of existing and potential catering customers." (SAP, p. 15, ¶ 89, Exhibit 10).

74.     Under Count III–Permanent Injunction, SGN seeks equitable relief in the form of a permanent injunction. (SAP, p. 16, ¶ 102, Exhibit 10).

75.     Under Count IV–Intentional Deceit, Fraud, Fraudulent Inducement and False Representations, SGN seeks the following damages: "SGN prays the Court award it damages and order L. Schulz to assign all right, title and interest in the trade name "LUDGER'S CATERING" to SGN," or "[a]s alternative relief to a Permanent Injunction, SGN prays the Court rescind the Agreement and return the parties to the status quo." (SAP, p. 18, ¶¶ 116-117, Exhibit 10).

76.     Under Count V–Intentional Non-Disclosure or Concealment of a Material Fact, SGN seeks the following damages: "SGN prays the Court award it damages and order L. Schulz to assign/transfer all rights, title and interest in the trade name "LUDGER'S

CATERING" to SGN," or "[i]n the alternative to an award of a permanent injunction against the Defendants, SGN prays the Court rescinds (sic) the Agreement and return the parties to the status quo." (SAP, p. 19, ¶¶ 128-129, Exhibit 10).

77.    Under Count VI–Wrongful Interference with Property, SGN seeks the following damages: "SGN prays the Court award it damages and order L. Schulz to assign/transfer all rights, title and interest in the trade name "LUDGER'S CATERING" to SGN. (SAP, p. 20, ¶ 133, Exhibit 10).

### III.    THE STATE FARM BUSINESSOWNERS POLICIES

### A.    Policy Number 96-BL-R081-7

#### i.    *SGN Does not Seek to Recover From Schulz or Sweet Appetit for "Bodily Injury" or "Property Damage" Caused by an "Occurrence"*

78.    State Farm adopts and incorporates herein paragraphs 1 through 77 of this Complaint.

79.    From September 15, 2011 to August 29, 2017, State Farm insured Sweet Appetit under Policy Number 96-BL-R081-7.

80.    Subject to its terms and conditions, the Policy extends coverage  to "bodily injury" or "property damage" caused by an "occurrence," and to "'personal and advertising injury' caused by an offense arising out of your business." Specifically, the coverage extension clause in the Policy provides in relevant part as follows:

23

_____
**Coverage L – Business Liability**
_____

1.      When a Limit Of Insurance is shown in the Declarations for **Coverage L – Business Liability**, we will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies....

                                    ***

2.      This insurance applies:

    a.      To "bodily injury" and "property damage" only if:

        (1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2)     The "bodily injury" or "property damage" occurs during the policy period;

                                    ***

    b.      To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

(Policy 96-BL-R081-7, Businessowners Coverage Form, CMP-4100, p. 23, ¶¶ 1., 2. a. (1) (2), 2. b. Exhibit 23).[1]

_____

[1]  Although this declaratory judgment action involves two policies (Policy Number 96-BL-R081-7 and Policy Number 96-BS-E946-7), and policy periods beginning September 15, 2011 to present, the Policies all contain the same Businessowners Coverage Form, CMP 4100. Certified copies of the entire Policies are attached as Exhibits 1 through 9. For simplicity, State Farm attaches Businessowners Coverage Form, CMP 4100, separately as Exhibit 23 to this Complaint. The Form also appears with each of the nine certified Policies attached as Exhibits 1 through 9 to this Complaint.

24

81.    The Policy defines the term "bodily injury" as follows:

**3.**    "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting any of these at any time. "Bodily injury" includes mental anguish or other mental injury caused by the "bodily injury."

(Policy 96-BL-R081-7, Businessowners Coverage Form, CMP-4100, p. 34, ¶ 3, Exhibit 23).

82.    SGN's SAP is devoid of any claims to recover from Sweet Appetit or Schulz for "bodily injury" as that term is defined in the Policy. (SAP, Exhibit 10).

83.    The Policy defines the term "property damage" in relevant part as follows:

**21.**    "Property damage" means:

**a.**    Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.**    Loss of use of tangible property that is not physically injured or destroyed, provided such loss of use is caused by physical injury to or destruction of other tangible property. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Policy 96-BL-R081-7, Businessowners Coverage Form, CMP-4100, p. 36, ¶ 21, Exhibit 23).

84.    SGN's SAP is devoid of any claim to recover from Sweet Appetit or Schulz for "property damage" as that term in defined in the Policy. (SAP, Exhibit 10).

85.    Even if SGN seeks to recover from Sweet Appetit or Schulz for "bodily injury" or "property damage" within the meaning of those terms in the Policy, coverage extends only if the "'bodily injury' or 'property damage' is caused by an "occurrence." (Policy 96-BL-R081-7, Businessowners Coverage Form, CMP-4100, p. 23, ¶¶ 1., 2. a. (1) (2), 2. b., Exhibit

25

23).

86.     The Policy defines the term "occurrence" as follows: "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Policy 96-BL-R081-7, Businessowners Coverage Form, CMP-4100, p. 36, ¶ 17, Exhibit 23).

87.     Under Oklahoma law, an "accident" is "[a]n event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event, chance, contingency." *United States Fidelity & Guaranty Co. v. Briscoe*, 1951 OK 386, ¶ 10, 239 P.2d 754, 757. The *Briscoe* court defined the term "accidental" as "happening by chance or unexpectedly, undesigned, unintentional; unforseen, or unpremeditated." *Id.*

88.     SGN does not seek to recover from Sweet Appetit and/or Schulz for damages caused by an "accident" within the meaning of that term in the Policy and under Oklahoma law. Instead, SGN seeks the following damages:

A.     Alleged damages arising from catering activities of Schulz and Sweet Appetit.

B.     Disgorgement of income from alleged catering activities of Schultz and Sweet Appetit, (SAP, p. 14, ¶ 80, Exhibit 10).

C.     Alleged damages for reputation injury and loss of catering customers, (SAP, p. 15, ¶ 89, Exhibit 10).

D.     Rescission of the Purchase and Sale Agreement and return of the parties to the status quo, (SAP, p. 18, ¶¶ 116-117, Exhibit 10).

E.     Permanent injunction preventing Schultz and Sweet Appetit from catering activities, (SAP, p. 19, ¶¶ 128-129, Exhibit 10).

26

F.    Damages for alleged wrongful interference with SGN's property, i.e, alleged deprivation of "its exclusive and perpetual right to its trade name," (SAP, p. 20, ¶ 133, Exhibit 10).

G.    Damages arising from alleged "deceptive intent," "intentional interference," "intentional deceit," "intentional concealment," "malicious and deceptive actions," and alleged wrongful interference with "SGN's property, namely, its tradenames and its usage of the 'LUDGER'S' name associated with catering services," (SAP, ¶¶ 57, 76, 114, 119, 121, 122, 125, 131, p. 20, ¶ 2).

H.    Damages arising from "registration of the trade name of 'LUDGER'S Catering' in early March 2019," (SAP, ¶¶ 114, 126, Exhibit 10).

   ii.    **SGN Does not Seek to Recover From Schulz or Sweet Appetit for "Personal and Advertising Injury" as Defined by Policy Number 96-BL-R081-7.**

89.    State Farm adopts and incorporates herein paragraphs 1 through 88 of this Complaint.

90.    Subject to its terms and conditions, Policy Number 96-BL-R081-7 extends coverage to "'personal and advertising injury' caused by an offense arising out of your business." (Policy 96-BL-R081-7, Businessowners Coverage Form, CMP-4100, p. 23, ¶ 2. b., Exhibit 23).

91.    The Policy defines the term "personal and advertising injury" as follows:

**18.**   "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   **a.**    False arrest, detention or imprisonment;

   **b.**    Malicious prosecution;

   **c.**    The wrongful eviction from, wrongful entry into, or invasion of

27

the right of privacy, of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.**    Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.**    Oral or written publication, in any manner of material that violates a person's right to privacy;

**f.**    The use of another's advertising idea in your "advertisement", or

**g.**    infringing upon another's copyright, trade dress or slogan in your "advertisement."

(Policy 96-BL-R081-7, Businessowners Coverage Form, CMP-4100, p. 36, ¶ 18, Exhibit 23).

92.   The Policy defines the term "advertisement" as follows:

**1.**    "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.**    Notices that are published include material placed on the internet or on similar electronic means of communication; and

**b.**    Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

(Policies, Businessowners Coverage Form, CMP-4100, p. 35, ¶ 1).

93.   The personal and advertising injury coverage is offense based coverage available when the insured has been sued for one or more of the enumerated offenses. *See Hanover Am. Ins. Co. v. Saul*, 2013 WL 4542284, *6 (W.D. Okla. Aug. 27, 2013) ("Because

28

Balfour [insured] was not sued for one of the enumerated offenses, she is not entitled to either a defense or indemnification under the policy."); *United Pac. Ins. Co. v. First Interstate Bancsystems, Inc*., 690 F. Supp. 917, 918 (D. Mont. 1987) (no personal injury coverage where complaint did not specifically allege enumerated tort).

94.     SGN has sued Schulz and Sweet Appetit for "Count I (Tortious Interference With Existing And Prospective Business Relationships.)" (SAP, pp. 13-14, ¶¶ 72-80, Exhibit 10). Tortious Interference With Existing And Prospective Business Relationships is not one of the offenses included in the definition of "personal and advertising injury" set forth in Policy Number 96-BL-R081-7. Therefore, the Policy does not provide coverage for the claim set forth in Count I.

95.     SGN has sued Schulz and Sweet Appetit for "Count II (Violation of Oklahoma Deceptive Trade Practice Act.)" (SAP, pp. 14-15, ¶¶ 81-90, Exhibit 10). SGN's claim under the Oklahoma Deceptive Trade Practice Act ("ODTPA") is set forth in its SAP as follows:

> 83.     Under 78 Okla. Stat. § 53 (a)(1)(2),(3), it is prima evidence of intent to injure competitors and an act constituting a deceptive trade practice, if a person passes off goods or services as those of another, knowingly makes a false representation as to the source, sponsorship, approval, or certification of goods or services, or knowingly makes a false representation as to affiliation, connection, association with, or certification of another.

(SAP, p. 14, ¶ 83, Exhibit 10). The sections of the ODTPA relied upon by SGN are as follows:

> A.     A person engages in a deceptive trade practice when in the course of business, vocation, or occupation, the person:

29

1.      Passes off goods or services as those of another;

2.      Knowingly makes a false representation as to the source, sponsorship, approval, or certification of goods or services;

3.      Knowingly makes a false representation as to affiliation, connection, association with, or certification by another;

***

5.      Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits or quantities of goods or services or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;

***

B.      Evidence that a person has engaged in a deceptive trade practice shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition.

(Okla. Stat. tit. 78, § 53). Violation of the foregoing sections of the ODTPA does not constitute any of the offenses included in the definition of "personal and advertising injury" set forth in Policy Number 96-BL-R081-7.  Therefore, the Policy does not provide coverage for the claim set forth in Count II.

96.     SGN has sued Schulz and Sweet Appetit for "Count III (Permanent Injunction)." (SAP, pp. 15-16, ¶¶ 91-102, Exhibit 10). Permanent Injunction is not one of the offenses included in the definition of "personal and advertising injury" set forth in Policy Number 96-BL-R081-7.  Therefore, the Policy does not provide coverage for the claim set forth in Count III.

30

97.     SGN has sued Schulz for "Count IV (Intentional Deceit, Fraud, Fraudulent Inducement & False Representation)." (SAP, pp. 16-18, ¶¶ 103-117, Exhibit 10). Intentional Deceit, Fraud, Fraudulent Inducement & False Representation are not offenses included in the definition of "personal and advertising injury" set forth in Policy Number 96-BL-R081-7. Therefore, the Policy does not provide coverage for the claim set forth in Count IV.

98.     SGN has sued Schulz for "Count V (Intentional Non-Disclosure or Concealment of a Material Fact)." (SAP, pp. 18-19, ¶¶ 118-129, Exhibit 10). Intentional Non-Disclosure or Concealment of a Material Fact is not one of the offenses included in the definition of "personal and advertising injury" set forth in Policy Number 96-BL-R081-7. Therefore, the Policy does not provide coverage for the claim set forth in Count V.

99.     SGN has sued Schulz for "Count VI (Wrongful Interference With Property)." (SAP, p. 20, ¶¶ 130-133, Exhibit 10). Wrongful Interference With Property is not one of the offenses included in the definition of "personal and advertising injury" set forth in Policy Number 96-BL-R081-7.  Therefore, the Policy does not provide coverage for the claim set forth in Count VI.

100.    Because the claims asserted by SGN against Schulz and Sweet Appetit are not offenses enumerated in the definition of "personal and advertising injury" set forth in Policy Number 96-BL-R081-7, the Policy does not extend coverage to the claims.

101.    The phrase "legally obligated to pay as damages" set forth in the Business Liability Coverage extension clause in Policy Number 96-BL-R081-7 limits coverage to tort

claims and not contract claim. *Boggs v. Great N. Ins. Co.*, 659 F. Supp.2d 1199, 1210 (N.D. Okla. 2009) ("The phrases 'legally obligated to pay' and 'Liability imposed by law' refer only to tort claims and not contract claims.") (quoting *VBF, Inc. v. Chubb Group of Ins. Cos.*, 263 F.3d 1226, 1231(10th Cir. 2001)). In its Counts IV and V against Schultz, "SGN prays the Court rescind the Agreement and return the parties to the status quo." (SAP, p. 18, ¶ 117; p. 19, ¶ 129, Exhibit 10). Rescinding the Purchase and Sale Agreement and returning the parties to status quo is a contract claim to which Policy Number 96-BL-R081-7 does not extend coverage.

### iii.    *Policy Number 96-BL-R081-7–Exclusions*

102.    State Farm adopts and incorporates herein paragraphs 1 through 101 of this Complaint.

103.    In the alternative, even if coverage under Policy Number 96-BL-R081-7 extends to damages SGN seeks to recover from Schulz and Sweet Appetit, the damages are excluded from coverage by one or more of the following exclusions:

**Section II – Exclusions**

Applicable to **Coverage L – Business Liability**, this insurance does not apply to:

***

**17.    Personal And Advertising injury**

      **a.**      Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict

"personal and advertising injury";

\*\*\*

e.    Arising out of breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

\*\*\*

l.    Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertisement idea in your "advertisement." However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan;

m.    Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags.

(Policy 96-BL-R081-7, Businessowners Coverage Form, CMP-4100, p. 28, ¶ 17, Exhibit 23).

104.    Pursuant to Exclusion 17.a., no coverage exists for personal and advertising injury "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" Exclusion 17.a. applies based on the following facts, among others:

A.    Schulz was the President of Black Forest Café, Inc.[2] Black Forest Café, which includes its owners, directors, members, officers, managers, employees, and its successors and assign,[3] sold to SGN "the right to operate in perpetuity and exclusively the catering and private dining room establishment of Ludger's Catering."[4] "Black Forest sold this

---

[2]  Purchase and Sale Agreement, p. 11, Exhibit 11.

[3]  Purchase and Sale Agreement, pp. 1, 2, ¶ (r), Exhibit 11.

[4]  Order of April 17, 2019, ¶ 2, Exhibit 20; Purchase and Sale Agreement, Article 2, Section 2.01, Exhibit 11.

33

'exclusive right,' Ludger's goodwill, trademarks and a covenant not to compete for $275,000.00 to Plaintiff [SGN]."[5]

B.      On October 25, 2009, Schulz, as President of Black Forest Café, Inc., executed a Transfer of Trade Name Report transferring the name "Ludger's Catering and Dining Room" from Black Forest Café, Inc., to SGN Foods, LLC.[6]

C.      On September 9, 2010, Schulz, as President of Black Forest Café, Inc., transferred to Sweet Appetit, Inc., the trade name "Ludger's Cakes."[7] In 2015, Sweet Appetit, Inc., provided a "Catering Menu."[8]

D.      In 2015, Sweet Appetit, Inc., "acknowledged providing catering services to Walgreens during that time period on a few occasions and also acknowledged that their website was 'confusing.'"[9]

E.      In 2018, Sweet Appetit, Inc., was again offering a "Catering Menu."[10] Thereafter, SGN sent a cease and desist letter to Sweet Appetit, Inc.[11] "As of December 10, 2018, according to the testimony of Plaintiff's [SGN's] witness Megan Sherrill, the Defendant [Sweet Appetit, Inc.] removed the words 'Catering Menu' from its website but were still engaged in catering through offering breakfast and lunch bundles for large numbers."[12]

F.      According to the Court in the Underlying Action, "[i]t appears the food services being provided were identical as those food services which previously had the heading "Catering Menu" and the current menu is

---

[5]  Order of April 17, 2019, ¶ 2, Exhibit 20.

[6]  Transfer of Trade Name Report, 10-25-2009, Exhibit 21.

[7]  Transfer of Trade Name Report, 9-9-2010, Exhibit 14.

[8]  Order of April 17, 2019, ¶ 7, Exhibit 20.

[9]  Order of April 17, 2019, ¶ 7, Exhibit 20.

[10]  Order of April 17, 2019, ¶ 8, Exhibit 20.

[11]  Order of April 17, 2019, ¶ 8, Exhibit 20.

[12]  Order of April 17, 2019, ¶ 8, Exhibit 20.

headed "Breakfast" and "Lunch" Bundles."[13]

G.    The Court in the Underlying Action ruled as follows: "13.) The evidence is clear that even the Defendant [Sweet Appetit] recognized per the 2015 email communications with the Plaintiff [SGN] that it did not 'push' its breakfast trays 'because many of the suggested targets would be to advertise to pharmaceutical reps and other types of clientele that we know are a core part of your business.'"[14]

H.    The Court also ruled that "[t]he Defendant [Sweet Appetit] recognizes that this type of food service, providing meals, in essence, to large numbers of persons, even for pick up, as catering activity which, under the Ludger's name lies exclusively with Plaintiff [SGN]."[15]

I.    On March 12, 2019, Schulz, in his individual capacity, registered with the Oklahoma Secretary of State, the trade name of "LUDGER'S CATERING."[16]

J.    SGN's claim against Schultz and Sweet Appetit under the ODTPA, requires SGN to establish that Schultz and Sweet Appetit "knowingly ma[de] a false representation as to the source ... of goods or services," and/or "knowingly ma[de] a false representation as to affiliation, connection, association with, or certification of another."[17]

K.    The Court in the Underlying Action held that "the evidence supports a probable finding that the coupling of the Ludger's Cakery name with catering services (overt acts of Defendants), would be an intentional act by the Defendant [Sweet Appetit] to mislead the public."[18] The Court held that "[b]ased on the foregoing, the Court finds that the Plaintiff [SGN] has adequately shown that it would likely succeed on the merits

---

[13]  Order of April 17, 2019, ¶ 8, Exhibit 20.

[14]  Order of April 17, 2019, ¶ 13, Exhibit 20.

[15]  Order of April 17, 2019, ¶ 13, Exhibit 20.

[16]  Secretary of State Trade Name Report, 3-12-2019, Exhibit 22.

[17]  Order of April 17, 2019, p. 5, Exhibit 20.

[18]  Order of April 17, 2019, p. 6, Exhibit 20.

as to the deceptive trade practices claim."[19]

105.    The foregoing facts, and others, establish that even if personal and advertising injury coverage extends to SGN's claims against Schulz and Sweet Appetit, the personal and advertising injury was "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" As such, the exclusion applies, thereby eliminating coverage.

106.    Pursuant to Exclusion 17.e., no coverage exists for personal and advertising injury "[a]rising out of breach of contract." The Court in the Underlying Action held that SGN "purchased for a substantial sum the trade name Ludger's Catering and Dining Room ... and the contractual right to operate Ludger's Catering, under that trade name 'in perpetuity and exclusively."[20] The Court further held that "[i]t is reasonably probable the Defendant [Sweet Appetit], by providing catering services on occasion under the Ludger's name has interfered with that contractual right." To the extent SGN seeks to recover for damages arising out of the breach of the Purchase and Sale Agreement and/or the Licensing Agreement, such damages fall within Exclusion 17.e.

107.    Pursuant to Exclusion 17.l., no coverage exists for personal and advertising injury [a]rising out of the infringement of ... trademark." Accordingly, even if Policy Number 96-BL-R081-1 extended coverage for infringement of trademark, which it does not, and SGN

---

[19]  Order of April 17, 2019, p. 6, Exhibit 20.

[20]  Order of April 17, 2019, p. 4, Exhibit 20.

seeks such damages, the Policy excludes coverage for personal and advertising injury arising from trademark infringement pursuant to Exclusion 17.l.

108.    In Count III of the SAP, SGN seeks a permanent injunction.  Even if coverage extends to such a claim, one or more of the above quoted exclusions apply, thereby negating coverage.

109.    In addition to actual damages, SGN seeks to recover punitive damages from Schulz and Sweet Appetit. Even if the Policy provides coverage, which State Farm denies, Oklahoma public policy does not allow a defendant to escape liability for punitive damages by shifting the loss onto an insurer.  *See Dayton Hudson Corp. v. American Mut. Liab. Ins.*, 521 P.2d 1155 (Okla. 1980). Thus, the Policy does not provide coverage for the punitive damages SGN seeks to recover from Schulz and Sweet Appetit.

110.    The Policy contains an Expected Or Intended Injury Exclusion which eliminates coverage for "**a.** 'Bodily injury' or 'property damage' expected or intended to cause harm as would be expected by a reasonable person; or **b.** 'Bodily injury' or 'property damage' which is the result of willful or malicious ... acts of an insured." (Policy, Businessowners Coverage Form, CMP-4100, p. 24, ¶ 1, Exhibit 23). SGN alleges that Schulz's and Sweet Appetit's "intentional past and continued interference is malicious and wrongful, and such interference is neither justified, privileged, nor excusable." (SAP, ¶ 76, Exhibit 10). To the extent SGN seeks to recover from Schulz or Sweet Appetit for injury that was intended, expected, or the result of willful or malicious acts of Schulz or Sweet Appetit,

37

the foregoing exclusion applies.

**B. Policy Number 96-BS-E946-7**

***i. SGN Does not Seek to Recover From Schulz or Sweet Appetit for "Bodily Injury" or "Property Damage" Caused by an "Occurrence"***

111. State Farm adopts and incorporates herein paragraphs 1 through 110 of this Complaint.

112. From August 29, 2018 to present, State Farm insured Sweet Appetit under Policy Number 96-BS-E946-7.

113. Subject to its terms and conditions, Policy Number 96-BS-E946-7 extends coverage to "bodily injury" or "property damage" caused by an "occurrence," and to "'personal and advertising injury' caused by an offense arising out of your business." Specifically, the coverage extension clause in the Policy provides in relevant part as follows:

---

**Coverage L – Business Liability**

1. When a Limit Of Insurance is shown in the Declarations for **Coverage L – Business Liability**, we will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies....

&#42;&#42;&#42;

2. This insurance applies:

   a. To "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

> **(2)** The "bodily injury" or "property damage" occurs during the policy period;
>
> ***
>
> **b.** To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

(Policy Number 96-BS-E946-7, Businessowners Coverage Form, CMP-4100, p. 23, ¶¶ 1., 2. a. (1) (2), 2. b. Exhibit 23).

114.   The Policy defines the term "bodily injury" as follows:

> **3.** "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting any of these at any time. "Bodily injury" includes mental anguish or other mental injury caused by the "bodily injury."

(Policy Number 96-BS-E946-7, Businessowners Coverage Form, CMP-4100, p. 34, ¶ 3, Exhibit 23).

115.   SGN's SAP is devoid of any claims to recover from Sweet Appetit or Schulz for "bodily injury" as that term is defined in Policy. (SAP, Exhibit 10).

116.   The Policy defines the term "property damage" in relevant part as follows:

> **21.** "Property damage" means:
>
> **a.** Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> **b.** Loss of use of tangible property that is not physically injured or destroyed, provided such loss of use is caused by physical injury

39

> to or destruction of other tangible property. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Policy Number 96-BS-E946-7, Businessowners Coverage Form, CMP-4100, p. 36, ¶ 21, Exhibit 23).

117.    SGN's SAP is devoid of any claim to recover from Sweet Appetit or Schulz for "property damage" as that term in defined in the Policy Number 96-BS-E946-7 (SAP, Exhibit 10).

118.    Even if SGN seeks to recover from Sweet Appetit or Schulz for "bodily injury" or "property damage" within the meaning of those terms in the Policy, coverage extends only if the "bodily injury" or "property damage" was caused by an "occurrence." The Policy defines the term "occurrence" as follows: "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Policy Number 96-BS-E946-7, Businessowners Coverage Form, CMP-4100, p. 36, ¶ 17, Exhibit 23).

119.    Under Oklahoma law, an "accident" is "[a]n event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event, chance, contingency." *United States Fidelity & Guaranty Co. v. Briscoe*, 1951 OK 386, ¶ 10, 239 P.2d 754, 757. The *Briscoe* court defined the term "accidental" as "happening by chance or unexpectedly, undesigned, unintentional; unforseen, or unpremeditated." *Id.*

120.    SGN does not seek to recover from Sweet Appetit and/or Schulz for damages

caused by an "accident" within the meaning of that term in the Policy and under Oklahoma law. Instead, SGN seeks the following damages:

A.      Alleged damages arising from catering activities of Schulz and Sweet Appetit.

B.      Disgorgement of income from alleged catering activities of Schultz and Sweet Appetit, (SAP, p. 14, ¶ 80, Exhibit 10).

C.      Alleged damages for reputation injury and loss of catering customers, (SAP, p. 15, ¶ 89, Exhibit 10).

D.      Rescission of the Purchase and Sale Agreement and return of the parties to the status quo, (SAP, p. 18, ¶¶ 116-117, Exhibit 10).

E.      Permanent injunction preventing Schultz and Sweet Appetit from catering activities, (SAP, p. 19, ¶¶ 128-129, Exhibit 10).

F.      Damages for alleged wrongful interference with SGN's property, i.e, alleged deprivation of "its exclusive and perpetual right to its trade name," (SAP, p. 20, ¶ 133, Exhibit 10).

G.      Damages arising from alleged "deceptive intent," "intentional interference," "intentional deceit," "intentional concealment," "malicious and deceptive actions," and alleged wrongful interference with "SGN's property, namely, its tradenames and its usage of the 'LUDGER'S' name associated with catering services," (SAP, ¶¶ 57, 76, 114, 119, 121, 122, 125, 131, p. 20, ¶ 2).

H.      Damages arising from "registration of the trade name of 'LUDGER'S Catering' in early March 2019," (SAP, ¶¶ 114, 126, Exhibit 10).

   ***ii.       SGN Does not Seek to Recover From Schulz or Sweet Appetit for "Personal and Advertising Injury" as Defined by Policy Number 96-BS-E946-7.***

121.    State Farm adopts and incorporates herein paragraphs 1 through 120 of this Complaint.

122.   Subject to its terms and conditions, the Policy extends coverage to "'personal and advertising injury' caused by an offense arising out of your business." (Policy 96-BS-E946-7, Businessowners Coverage Form, CMP-4100, p. 23, ¶ 2. b., Exhibit 23).

123.   The Policy defines the term "personal and advertising injury" as follows:

**18.**   "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    **a.**   False arrest, detention or imprisonment;

    **b.**   Malicious prosecution;

    **c.**   The wrongful eviction from, wrongful entry into, or invasion of the right of privacy, of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    **d.**   Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    **e.**   Oral or written publication, in any manner of material that violates a person's right to privacy;

    **f.**   The use of another's advertising idea in your "advertisement", or

    **g.**   infringing upon another's copyright, trade dress or slogan in your "advertisement."

(Policy 96-BS-E946-7, Businessowners Coverage Form, CMP-4100, p. 36, ¶ 18, Exhibit 23).

124.   Policy Number 96-BS-E946-7 was amended effective April 9, 2018. The amendment included adding Policy Endorsement CMP-4561.1 which modified the Policy definition of "personal and advertising injury" in relevant part as follows:

**CMP-4561.1 POLICY ENDORSEMENT**

This endorsement modifies insurance provided under the following:
BUSINESSOWNERS COVERAGE FORM

\*\*\*

e.      **SECTION II – DEFINITIONS** is amended as follows:

\*\*\*

**(3)**      Paragraphs **18.f** and **g.** of "personal and advertising injury" are replaced by the follows:

**f.**      The use of another's advertising idea in your "advertisement";

**g.**      Infringing upon another's trade dress or slogan in your "advertisement", or

**h.**      Infringement of another's copyright, patent, trademark, or trade secret.

(Policy 96-BS-E946-7, CMP–4561.1 POLICY ENDORSEMENT, P. 4-5, ¶ e. (3), Exhibit

24).

125.   The Policy defines the term "advertisement" as follows:

**1.**      "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.**      Notices that are published include material placed on the internet or on similar electronic means of communication; and

**b.**      Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

(Policy 96-BS-E946-7, Businessowners Coverage Form, CMP-4100, p. 35, ¶ 1, Exhibit 23).

126.    The Personal and Advertising injury coverage is offense based coverage available when the insured has been sued for one or more of the enumerated offenses. *See Hanover Am. Ins. Co. v. Saul*, 2013 WL 4542284, *6 (W.D. Okla. Aug. 27, 2013) ("Because Balfour [insured] was not sued for one of the enumerated offenses, she is not entitled to either a defense or indemnification under the policy."); *United Pac. Ins. Co. v. First Interstate Bancsystems, Inc*., 690 F. Supp. 917, 918 (D. Mont. 1987) (no personal injury coverage where complaint did not specifically allege enumerated tort).

127.    SGN has sued Schulz and Sweet Appetit for "Count I (Tortious Interference With Existing And Prospective Business Relationships.)" (SAP, pp. 13-14, ¶¶ 72-80, Exhibit 10). Tortious Interference With Existing And Prospective Business Relationships is not one of the offenses included in the definition of "personal and advertising injury" set forth in Policy Number 96-BS-E946-7. Therefore, the Policy does not provide coverage for the claim set forth in Count I.

128.    SGN has sued Schulz and Sweet Appetit for "Count II (Violation of Oklahoma Deceptive Trade Practice Act.)" (SAP, pp. 14-15, ¶¶ 81-90, Exhibit 10). SGN's claim under the Oklahoma Deceptive Trade Practice Act ("ODTPA") is set forth in its SAP as follows:

> 83.    Under 78 Okla. Stat. § 53 (a)(1)(2),(3), it is prima evidence of intent to injure competitors and an act constituting a deceptive trade practice, if a person passes off goods or services as those of another, knowingly makes a false representation as to the source, sponsorship, approval, or certification of goods or services, or knowingly makes a false representation as to affiliation, connection, association with, or certification of another.

(SAP, p. 14, ¶ 83, Exhibit 10). The sections of the ODTPA relied upon by SGN are as follows:

 A. A person engages in a deceptive trade practice when in the course of business, vocation, or occupation, the person:

 1. Passes off goods or services as those of another;

 2. Knowingly makes a false representation as to the source, sponsorship, approval, or certification of goods or services;

 3. Knowingly makes a false representation as to affiliation, connection, association with, or certification by another;

         ***

 5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits or quantities of goods or services or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;

         ***

 B. Evidence that a person has engaged in a deceptive trade practice shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition.

(Okla. Stat. tit. 78, § 53). Violation of the foregoing sections of the ODTPA does not constitute any of the offenses included in the definition of "personal and advertising injury" set forth in Policy Number 96-BS-E946-7. Therefore, the Policy does not provide coverage for the claim set forth in Count II.

 129. SGN has sued Schulz and Sweet Appetit for "Count III (Permanent Injunction)." (SAP, pp. 15-16, ¶¶ 91-102, Exhibit 10). Permanent Injunction is not one of the

offenses included in definition of "personal and advertising injury" set forth in Policy 96-BS-E946-7. Therefore, the Policy does not provide coverage for the claim set forth in Count III.

130.    SGN has sued Schulz for "Count IV (Intentional Deceit, Fraud, Fraudulent Inducement & False Representation)." (SAP, pp. 16-18, ¶¶ 103-117, Exhibit 10). Intentional Deceit, Fraud, Fraudulent Inducement & False Representation are not offenses included in the definition of "personal and advertising injury" set forth in Policy 96-BS-E946-7. Therefore, the Policy does not provide coverage for the claim set forth in Count IV.

131.    SGN has sued Schulz for "Count V (Intentional Non-Disclosure or Concealment of a Material Fact)." (SAP, pp. 18-19, ¶¶ 118-129, Exhibit 10). Intentional Non-Disclosure or Concealment of a Material Fact is not one of the offenses included in the definition of "personal and advertising injury" set forth in Policy 96-BS-E946-7. Therefore, the Policy does not provide coverage for the claim set fourth in Count V.

132.    SGN has sued Schulz for "Count VI (Wrongful Interference With Property)." (SAP, p. 20, ¶¶ 130-133, Exhibit 10). Wrongful Interference With Property is not one of the offenses included in the definition of "personal and advertising injury" set forth in Policy 96-BS-E946-7. Therefore, the Policy does not provide coverage for the claim set forth in Count VI.

133.    Because the claims asserted by SGN against Schulz and Sweet Appetit are not offenses enumerated in the definition of "personal and advertising injury" set forth in Policy 96-BS-E946-7, the Policy does not extend coverage to the claims.

134.    The phrase "legally obligated to pay as damages" set forth in the Business Liability Coverage extension clause in Policy 96-BS-E946-7 limits coverage to tort claims and not contract claim. *Boggs v. Great N. Ins. Co*., 659 F. Supp.2d 1199, 1210 (N.D. Okla. 2009) ("The phrases 'legally obligated to pay' and 'Liability imposed by law' refer only to tort claims and not contract claims.") (quoting *VBF, Inc. v. Chubb Group of Ins. Cos*., 263 F.3d 1226, 1231(10th Cir. 2001)). In its Counts IV and V against Schultz, "SGN prays the Court rescind the Agreement and return the parties to the status quo." (SAP, p. 18, ¶ 117; p. 19, ¶ 129, Exhibit 10). Rescinding the Purchase and Sale Agreement and returning the parties to status quo is a contract claim to which Policy 96-BS-E946-7 does not extend coverage.

### iii.    *Policy Number 96-BS-E946-7–Exclusions*

135.    State Farm adopts and incorporates herein paragraphs 1 through 130 of this Complaint.

136.    In the alternative, even if coverage under Policy 96-BS-E946-7 extends to the damages SGN seeks to recover from Schulz and Sweet Appetit, the damages are excluded from coverage by one or more of the following exclusions:

---

**Section II – Exclusions**

Applicable to **Coverage L – Business Liability**, this insurance does not apply to:

***

**17.    Personal And Advertising injury**

47

    **a.**    Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

***

    **e.**    Arising out of breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

***

    **l.**    Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertisement idea in your "advertisement." However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress of slogan;

    **m.**    Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags.

(Policy 96-BS-E946-7, Businessowners Coverage Form, CMP-4100, p. 28, ¶ 17, Exhibit 23).

137.   Pursuant to Exclusion 17.a., no coverage exists for personal and advertising injury "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" Exclusion 17.a. applies based on the following facts, among others:

    A.    Schulz was the President of Black Forest Café, Inc.[21] Black Forest Café, which includes its owners, directors, members, officers, managers, employees, and its successors and assign,[22] sold to SGN "the right to operate in perpetuity and exclusively the catering and private

---

[21]  Purchase and Sale Agreement, p. 11, Exhibit 11.

[22]  Purchase and Sale Agreement, pp. 1, 2, ¶ (r), Exhibit 11.

dining room establishment of Ludger's Catering."[23] "Black Forest sold this 'exclusive right,' Ludger's goodwill, trademarks and a covenant not to compete for $275,000.00 to Plaintiff [SGN]."[24]

B.   On October 25, 2009, Schulz, as President of Black Forest Café, Inc., executed a Transfer of Trade Name Report transferring the name "Ludger's Catering and Dining Room" from Black Forest Café, Inc., to SGN Foods, LLC.[25]

C.   On September 9, 2010, Schulz, as President of Black Forest Café, Inc., transferred to Sweet Appetit, Inc., the trade name "Ludger's Cakes."[26] In 2015, Sweet Appetit, Inc., provided a "Catering Menu."[27]

D.   In 2015, Sweet Appetit, Inc., "acknowledged providing catering services to Walgreens during that time period on a few occasions and also acknowledged that their website was 'confusing.'"[28]

E.   In 2018, Sweet Appetit, Inc., was again offering a "Catering Menu."[29] Thereafter, SGN sent a cease and desist letter to Sweet Appetit, Inc.[30] "As of December 10, 2018, according to the testimony of Plaintiff's [SGN's] witness Megan Sherrill, the Defendant [Sweet Appetit, Inc.] removed the words 'Catering Menu' from its website but were still engaged in catering through offering breakfast and lunch bundles for large numbers."[31]

---

[23] Order of April 17, 2019, ¶ 2, Exhibit 20; Purchase and Sale Agreement, Article 2, Section 2.01, Exhibit 11.

[24] Order of April 17, 2019, ¶ 2, Exhibit 20.

[25] Transfer of Trade Name Report, 10-25-2009, Exhibit 21.

[26] Transfer of Trade Name Report, 9-9-2010, Exhibit 14.

[27] Order of April 17, 2019, ¶ 7, Exhibit 20.

[28] Order of April 17, 2019, ¶ 7, Exhibit 20.

[29] Order of April 17, 2019, ¶ 8, Exhibit 20.

[30] Order of April 17, 2019, ¶ 8, Exhibit 20.

[31] Order of April 17, 2019, ¶ 8, Exhibit 20.

F.     According to the Court in the Underlying Action, "[i]t appears the food services being provided were identical as those food services which previously had the heading "Catering Menu" and the current menu is headed "Breakfast" and "Lunch" Bundles."[32]

G.     The Court in the Underlying Action ruled as follows: "13.) The evidence is clear that even the Defendant [Sweet Appetit] recognized per the 2015 email communications with the Plaintiff [SGN] that it did not 'push' its breakfast trays 'because many of the suggested targets would be to advertise to pharmaceutical reps and other types of clientele that we know are a core part of your business.'"[33]

H.     The Court also ruled that "[t]he Defendant [Sweet Appetit] recognizes that this type of food service, providing meals, in essence, to large numbers of persons, even for pick up, as catering activity which, under the Ludger's name lies exclusively with Plaintiff [SGN]."[34] On March 12, 2019, Schulz, in his individual capacity, registered with the Oklahoma Secretary of State, the trade name of "LUDGER'S CATERING."[35]

I.     SGN's claim against Schultz and Sweet Appetit under the ODTPA, requires SGN to establish that Schultz and Sweet Appetit "knowingly ma[de] a false representation as to the source ... of goods or services," and/or "knowingly ma[de] a false representation as to affiliation, connection, association with, or certification of another."[36]

J.     The Court in the Underlying Action held that "the evidence supports a probable finding that the coupling of the Ludger's Cakery name with catering services (overt acts of Defendants), would be an intentional act by the Defendant [Sweet Appetit] to mislead the public."[37] The Court

---

[32]  Order of April 17, 2019, ¶ 8, Exhibit 20.

[33]  Order of April 17, 2019, ¶ 13, Exhibit 20.

[34]  Order of April 17, 2019, ¶ 13, Exhibit 20.

[35]  Secretary of State Trade Name Report, 3-12-2019, Exhibit 22.

[36]  Order of April 17, 2019, p. 5, Exhibit 20.

[37]  Order of April 17, 2019, p. 6, Exhibit 20.

held that "[b]ased on the foregoing, the Court finds that the Plaintiff [SGN] has adequately shown that it would likely succeed on the merits as to the deceptive trade practices claim."[38]

138.    The foregoing facts, and others, establish that even if personal and advertising injury coverage extends to SGN's claims against Schulz and Sweet Appetit, the personal and advertising injury was "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" As such, the exclusion applies, thereby eliminating coverage.

139.    Pursuant to Exclusion 17.e., no coverage exists for personal and advertising injury "[a]rising out of breach of contract." The Court in the Underlying Action held that SGN "purchased for a substantial sum the trade name Ludger's Catering and Dining Room ... and the contractual right to operate Ludger's Catering, under that trade name 'in perpetuity and exclusively."[39] The Court further held that "[i]t is reasonably probable the Defendant [Sweet Appetit], by providing catering services on occasion under the Ludger's name has interfered with that contractual right." To the extent SGN seeks to recover for damages arising out of the breach of the Purchase and Sale Agreement and/or the Licensing Agreement, such damages fall within Exclusion 17.e.

140.    In Count III of the SAP, SGN seeks a permanent injunction.  Even if coverage extends to such a claim, which State Farm denies, one or more of the above quoted

---

[38]  Order of April 17, 2019, p. 6, Exhibit 20.

[39]  Order of April 17, 2019, p. 4, Exhibit 20.

51

exclusions apply, thereby negating coverage.

141.    In addition to actual damages, SGN seeks to recover punitive damages from Schulz and Sweet Appetit. Even if the Policy provides coverage, which State Farm denies, Oklahoma public policy does not allow a defendant to escape liability for punitive damages by shifting the loss onto an insurer. *See Dayton Hudson Corp. v. American Mut. Liab. Ins.*, 521 P.2d 1155 (Okla. 1980). Thus, the Policy does not provide coverage for the punitive damages SGN seeks to recover from Schulz and Sweet Appetit.

142.    The Policy contains an Expected Or Intended Injury Exclusion which eliminates coverage for "**a.** 'Bodily injury' or 'property damage' expected or intended to cause harm as would be expected by a reasonable person; or **b.** 'Bodily injury' or 'property damage' which is the result of willful or malicious ... acts of an insured." (Policies, Businessowners Coverage Form, CMP-4100, p. 24, ¶ 1, Exhibit 23). SGN alleges that Schulz's and Sweet Appetit's "intentional past and continued interference is malicious and wrongful, and such interference is neither justified, privileged, nor excusable." (SAP, ¶ 76, Exhibit 10). To the extent SGN seeks to recover from Schulz or Sweet Appetit for injury that was intended, expected, or the result of willful or malicious acts of Schulz or Sweet Appetit, the foregoing exclusion applies.

   C.    <u>The Duty to Defend–Policies 96-BL-R081-7 and 96-BS-E946-7</u>

143.    State Farm adopts and incorporates herein paragraphs 1 through 142 of this Complaint.

144.    The Policies require State Farm to provide a defense to Schulz and Sweet Appetit only if they are sued for covered damages. Specifically, the Policies provide in relevant part as follows:

**Coverage L – Business Liability**

When a Limit Of Insurance is shown in the Declarations for **Coverage L – Business Liability**, we will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" *to which this insurance applies. We will have the right and duty to defend the insured by counsel of our choice against any "suit" seeking those damages*. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or personal and advertising injury", *to which this insurance does not apply*. We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" with or without the insured's consent, for any reason and at any time.  But:

a.      The amount we will pay for damages is limited as described in **SECTION II – LIMITS OF INSURANCE**; and

b.      Our right and duty to defend ends when we have used up the applicable Limit Of Insurance in the payment of judgments or settlements or medical expenses.

(Policies, Businessowners Coverage Form, CMP-4100, p. 23, Exhibit 23) (emphasis added).

145.    For the reasons set forth herein, and others that may be discovered in this action, State Farm has no duty to continue to defend Schulz and Sweet Appetit in the Underlying Action because the damages SGN seeks to recover from Schulz and Sweet Appetit are not covered by the Policies and are damages "to which this insurance does not apply."

146.    An actual controversy exists between the parties concerning whether the

53

subject Policies provide defense and indemnity coverages in relation to the claims made against Schulz and Sweet Appetit in the Underlying Action, and State Farm has no adequate remedy by which this controversy may be resolved other than that which is requested by this Complaint for Declaratory Judgment.

**WHEREFORE**, State Farm seeks a declaratory judgment that the Policies do not extend coverage to the damages SGN seeks to recover from Schulz and Sweet Appetit in the Underlying Action, and if coverage is extended, Policy exclusions apply thereby negating coverage; and therefore:

(1)     State Farm has no duty to indemnify Schulz or Sweet Appetit for liability they may incur in the Underlying Action;

(2)     State Farm has no duty to continue the defense of Schulz and Sweet Appetit in the Underlying Action, or any other lawsuit or claim arising out of the same material facts as alleged in the Underlying Action; and

(3)     State Farm has no duty to satisfy any judgment entered against Schulz or Sweet Appetit in the Underlying Action, or any other lawsuit arising out of the same material facts as alleged in the Underlying Action.

For the reasons set forth herein, State Farm respectfully requests the Court grant it declaratory judgment as set forth herein, and requests it be awarded any further relief this Court deems just and proper.

Respectfully submitted,

**ATKINSON, HASKINS, NELLIS,
BRITTINGHAM, GLADD & FIASCO**


     /s/ Galen L. Brittingham
Galen L. Brittingham, OBA #12226
James N. Edmonds, OBA #15757
525 South Main, Suite 1500
Tulsa, Oklahoma 74103-4524
Telephone: (918) 582-8877
Facsimile: (918) 585-8096
***Counsel for Plaintiff, State Farm Fire
and Casualty Company***

S:\Files\441\63\Complaint-DJ-Sweet-Appetit-1-GLB.wpd

55