**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) | STATE FARM FIRE AND CASUALTY COMPANY, an Illinois Corporation, | ) ) ) ) |
| | Plaintiff, | ) ) |
| vs. | | ) ) |
| (1) | SWEET APPETIT, INC., an Oklahoma Corporation; | ) ) ) |
| (2) | LUDGER SCHULZ, and | ) ) |
| (3) | SGN FOODS, LLC, an Oklahoma Limited Liability Company, | ) ) ) ) |
| | Defendants. | ) ) |

Case No.  19-CV-630-CVE-JFJ

**MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF**
**STATE FARM FIRE AND CASUALTY COMPANY AND SUPPORTING BRIEF**

Respectfully submitted,
**ATKINSON, HASKINS, NELLIS,**
**BRITTINGHAM, GLADD & FIASCO**
A PROFESSIONAL CORPORATION
Galen L. Brittingham, OBA #12226
James N. Edmonds, OBA #15757
Wynoka Middleton McClellan, OBA #32833
1500 ParkCentre
525 South Main
Tulsa, OK 74103-4524
Telephone: (918) 582-8877
Facsimile: (918) 585-8096
*Attorneys for Plaintiff State Farm Fire and*
*Casualty Company*

**TABLE OF CONTENTS**

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    FACTS GIVING RISE TO UNDERLYING ACTION . . . . . . . . . . . . . . . . . . . 2

    II.    THE UNDERLYING ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    III.    THE STATE FARM POLICIES ISSUED TO SWEET APPETIT . . . . . . . . . . 11

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.    INSURANCE CONTRACT CONSTRUCTION . . . . . . . . . . . . . . . . . . . . . . . 12

    III.    THE INSURANCE POLICIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.    <u>The Extension of Coverage</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.    *SGN Does not Seek to recover From Sweet Appetit for "Bodily Injury" or "Property Damage"* . . . . . . . . . . . . . . . . . . . . . . 14

        2.    *SGN's Claims Against Sweet Appetit are not for "Bodily Injury" or "Property Damage" Caused by "Occurrence"* . . . . . 15

        3.    *SGN Does not Seek to Recover From Sweet Appetit for "Personal and Advertising Injury"* . . . . . . . . . . . . . . . . . . . . . 17

    B.    <u>Policy Exclusions</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        1.    *The Exclusion for the Unauthorized Use of Another's Name and for Tactics That Mislead Another's Potential Customers* . . . . 19

        2.    *The Exclusion for acts Known to Inflict Personal and Advertising Injury* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        3.    *Exclusion for Trademark Infringement* . . . . . . . . . . . . . . . . . . . . . . 24

i

C.      The Duty to Defend. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

*Cases*                                                                 *Page(s)*

*Above It All Roofing & Constr., Inc. v. Sec. Nat'l Ins. Co.*,
    285 F. Supp. 3d 1224, 1238 (N.D. Okla. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Am. Econ. Ins. Co. v. Bogdahn*,
    89 P.3d 1051, 1054 (Okla. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Boggs v. Great N. Ins. Co.*,
    659 F. Supp. 2d 1199, 1204 (N.D. Okla. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15

*BP America, Inc. v. State Auto Prop. & Cas. Ins. Co.*,
    148 P.3d 832, 842 (Okla. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 327, 106 S. Ct. 2548 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Dayton Hudson Corp. v. Am. Mut. Liab. Ins.*,
    621 P.2d 1155, 1160 (Okla. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Dodson v. St. Paul Ins. Co.*,
    812 P.2d 372, 376 (Okla. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Elett Bros., Inc. v. U.S. Fid. & Guar. Co.*,
    275 F.3d 384 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Farmers Alliance Mut. Ins. Co. v. Willingham*,
    2009 WL 3429768, *4 (N.D. Okla. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22

*Hanover Am. Ins. Co. v. Saul*,
    2013 WL 4542284, *6 (W. D. Okla.  2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hinkle v. State Farm Fire & Cas. Co.*,
    308 P.3d 1009, 1014 (N. M. App. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hunter v. Hirsig*,
    614 Fed. Appx. 960, 963 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hunter v. Hirsig*,
    614 Fed. Appx. 960, 963 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hurst v. Nationwide Mut. Ins. Co.*,

2020 WL 2988688, *3 (10th Cir. June 4, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Jones v. Farm Bureau Mut. Ins. Co.*,
    431 N.W.2d 242, 245 (Mich. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mass. Bay Ins. Co. v. Gordon*,
    708 F.Supp. 1232, 1234 (W.D. Okla. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Mullin v. Travelers Indem. Co. of Conn.*,
    541 F.3d 1219, 1223 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Phillips v. Greenfield*,
    859 P.2d 1101, 1105 (Okla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Pitman v. Blue Cross & Blue Shield of Okla.*,
    217 F.3d 1291, 1298 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Scottsdale Ins. Co. v. Owl Nite Sec., Inc.*,
    2006 WL 3742102, *4 (N.D. Okla. Dec. 15, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Stanford Ranch, Inc. v. Maryland Cas. Co.*,
    89 F.3d 618, 627 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*State Farm Fire & Cas. Co. v. Metro. Mgmt.*,
    2007 WL 4157148, *11 (D. Haw. August 29, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*State Farm Fire and Casualty Co. v. Prescott*,
    2019 WL 1840906 (Haw. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States Fid. & Guar. Co. v. Briscoe*,
    239 P.2d 754, 757 (Okla. 1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Webb v. Allstate Life Ins. Co.*,
    536 F.2d 336 (10th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Wiley v. Travelers Ins. Co.*,
    534 P.2d 1293, 1295 (Okla. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Yousuf v. Cohlmia*,
    741 F.3d 31, (10th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Zurich Am. Ins. Co. v. Good To Go, LLC*,
    2018 WL 8333413, *8 (W.D. Okla. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Other Authorities

15 O.S. 2011, § 157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

15 O.S.2011, §§ 154, 155. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

78 Okla. Stat. tit. 51 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

78 Okla. Stat. § 54. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

LCvR 56.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**COMES NOW** Plaintiff, State Farm Fire and Casualty Company ("State Farm"), and hereby moves for summary judgment pursuant to Fed. R. Civ. P. 56 and LCvR 56.1. This is a declaratory judgment action in which State Farm seeks rulings concerning the rights of the parties under two Businessowners Insurance Policies issued to Defendant, Sweet Appetit, Inc. ("Sweet Appetit").

## INTRODUCTION

In 2009, Ludger Schulz, then the owner of the Black Forest Café, sold to SGN Foods, LLC ("SGN"), the right to operate in perpetuity and exclusively a catering business under the name of "Ludger's Catering." On September 9, 2010, Schulz transferred to Sweet Appetit, the trade name "Ludger's Cakes." Sweet Appetit is owned by Schulz's stepdaughter, Allison Dickens.

On February 14, 2019,  SGN filed suit against Sweet Appetit in Tulsa County District Court ("Underlying Action"). In the Underlying Action, SGN alleges that Sweet Appetit's use of the name "Ludger's" in association with catering confused and misled SGN's customers and the general public. SGN filed a Motion for Temporary Injunction in the Underlying Action requesting that the court order Sweet Appetit to cease catering services. The court granted that motion. Thereafter, SGN filed a Second Amended Petition asserting claims against Sweet Appetit for alleged Tortious Interference with Existing and Prospective Business Relationship, Violation of Oklahoma's Deceptive Trade Practices Act, and for Permanent Injunction. SGN seeks to recover monetary damages, including disgorgement of profits alleged to have been made by Sweet Appetit from catering services.

From September 15, 2011 to August 29, 2017, State Farm insured Sweet Appetit under Businessowners Insurance Policy Number 96-BL-R081-7, and thereafter under Businessowners Insurance Policy Number 96-BS-E946-7. Subject to their terms and conditions, the Policies extend coverage to damages an insured becomes legally obligated to pay for "bodily injury" and "property

damage" caused by an "occurrence" (defined in the Policies as an "accident"), and to certain enumerated offenses defined in the Policies as "personal and advertising injury."

SGN has not sued Sweet Appetit for bodily injury or property damage caused by an accident, and has not sued Sweet Appetit for any of the enumerated offenses defined in the Policies as personal and advertising injury. Instead, SGN seeks: (1) an accounting from Sweet Appetit of all income from catering services received since September 9, 2010, and that the court order Sweet Appetit to disgorge all such catering profits; (2) an award of damages authorized by Okla. Stat. tit. 78, § 54 for alleged damage to SGN's reputation and loss of existing and potential catering customers; and (3) a permanent injunction enjoining Sweet Appetit from catering under the name "Ludger's." As more fully addressed herein, the Policies do not extend coverage to such damages and claims. In the alternative, if coverage is extended, policy exclusions apply thereby negating coverage, including an exclusion for personal and advertising injury arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags, or any other similar tactics used to mislead another's potential customers.

## STATEMENT OF UNDISPUTED FACTS

### I.   FACTS GIVING RISE TO UNDERLYING ACTION

1.     In 2009, Ludger Schulz was the "principal owner and operator of The Black Forest Café, Inc." ("BFC") (Purchase and Sale Agreement, Exhibit 1, p. 3, ¶ (q) and p. 11).

2.     In 2009, the operations of BFC included a (1) "catering and private dining room establishment" operated under the trade name "Ludger's Catering & Dining Room," and (2) a bakery operated under the trade names "Ludger's Cakes" and/or "Ludger's Bakery" and/or "Ludger's Bavarian Cakery." (Purchase and Sale Agreement, Exhibit 1, p. 3, ¶ 2.01; Declaration of Megan J. Sherrill ("DMS"), Exhibit 2, p. 1, ¶ 3).

3.  On October 29, 2009, Schulz, as President of BFC, entered into a Purchase and Sale Agreement with SGN. The Agreement provided that the "Seller [BFC], desires to sell all of the Assets, Stock Inventory, and the business and goodwill of a portion of the business of Seller doing business as (d/b/a) Ludger's Catering & Dining Room (hereinafter collectively referred to as 'Ludger's Catering')." (Purchase and Sale Agreement, Exhibit 1, p. 1,"WHEREAS" clause 1).

4.  The "TERMS OF SALE & CONDITIONS PRECEDENT" section of the Purchase and Sale Agreement provides that BFC was selling, and SGN was buying, "**the right to operate in perpetuity and exclusively the catering and private dining room establishment of Ludger's Catering**." (Purchase and Sale Agreement, Exhibit 1, p. 3, ¶ 2.01).

5.  As part of the Purchase and Sale Agreement, SGN purchased "the right to link to the website (www.ludgers.com) ... in perpetuity." (DMS, Exhibit 2, p. 1, ¶ 3).

6.  Approximately one year after the Purchase and Sale Agreement was executed, Schulz, as President of BFC, transferred the trade name "Ludger's Cakes" to Sweet Appetit, Inc. (Transfer of Trade Name Report, Exhibit 3).

7.  At all times relevant herein, Allison Dickens was the owner or co-owner of Sweet Appetit, Inc. Allison Dickens is the stepdaughter of Ludger Schulz. (Transcript of Hearing on Motion for Temporary and Permanent Injunction ("Hearing Transcript"), Testimony of Allison Dickens, Case No. CJ-2019-662, Exhibit 4, 128:7-10, 129:18-130:10).

8.  When Allison Dickens purchased Ludger's Cakery from her stepfather, Ludger Schulz, she was aware that he had sold the catering side of the business to SGN:

> Q.  Okay. So that was – – when you purchased the Cakery, were you advised that your stepfather had sold the right to operate in perpetuity and exclusively the catering and private dining room establishment of Ludger's Catering as set forth in this agreement?

A.     [Dickens] We were aware that he sold that side of the business.

(Hearing Transcript, Dickens Testimony, Exhibit 4, 164:19-24).

9.     At all times relevant herein, Megan J. Sherrill was the manager of SGN. (DMS, Exhibit 2, p. 1, ¶ 1).

10.    "On or about April 8, 2015, [Sherrill] became aware that Sweet Appetit was offering catering services in connection with the promotion and sale of its Ludger's Bavarian Cakery services, catering services that directly competed with LUDGER'S CATERING." (DMS, Exhibit 2, p. 2, ¶ 7).

11.    Sherrill sent an email to Dickens on April 14, 2015, "specifically rais[ing] concerns about the use of a 'Catering Menu' on the Ludger's Bavarian Cakery website and requested that Sweet Appetit refrain from providing catering services and cease advertising therefor." (DMS, Exhibit 2, pp. 2-3, ¶ 7).

12.    By email dated April 15, 2015, Sweet Appetit, through Dickens, acknowledged that they had filled two orders from Walgreens and that she understood the confusion. (Email, Allison Dickens to Megan Sherrill, 4-15-2015, Exhibit 5; DMS, Exhibit 2, p. 3, ¶ 8).

13.    Dickens advised Sherrill that she would address the confusion with the customer. (Hearing Transcript, Dickens Testimony, Exhibit 4, 169:25-170:3).

14.    After the email exchange in April 2015, Dickens removed the word "Catering" from the Menu. However, Sweet Appetit d/b/a Ludger's Bavarian Cakery, continued to have a link on its website that said "catering menu." (Hearing Transcript, Dickens Testimony, Exhibit 4, 169:5-16).

15.    Sweet Appetit/LUDGER'S Bavarian Cakery used the following email address link "www.ludgersbavariancakery.com." (Email, 4-15-2015, Exhibit 5, p. 2).

16.    As of November 30, 2018, Sweet Appetit, through the name "Ludger's Bavarian

4

Cakery," offered a "CATERING MENU" on its website. (Hearing Transcript, Dickens Testimony, Exhibit 4, 171:10-23; LUDGER'S Bavarian Cakery Menu, Exhibit 6).

17.     The metatag on Sweet Appetit's "LUDGER"S Bavarian Cakery" website, which offered the "CATERING MENU," was "https://ludgersbavariancakery.com/pages/ menus/catering-menu." (LUDGER'S Bavarian Cakery Menu, 11-30-2018, Exhibit 6).

18.     SGN repeatedly advised Sweet Appetit that its concern was Sweet Appetit's use the name "Ludger's" on its website where Sweet Appetit offered Menus titled "Catering Menu," "Breakfast Bundles Menu," and "Lunch Bundles Menu." (DMS, Exhibit 2, pp. 2-3, ¶ 7; p. 3, ¶ 9; p. 4-4, ¶ 12).

19.     On December 7, 2018, counsel for SGN sent a cease and desist letter to Sweet Appetit Schulz, and Dickens. In the cease and desist letter, SGN alleged that Sweet Appetit's use of the name Ludger's associated with catering confused SGN's customers and the public:

(a)     "SGN has expended considerable resources promoting its catering services under both the 'Ludger's Catering and Dining Room' and 'Ludger's Catering and Events' trade names ('LUDGER'S CATERING') and members of the public readily recognize the LUDGER'S CATERING trade names and the good will they symbolize." (Cease and Desist Letter, Exhibit 7, p. 2).

(b)     "Sweet Appetit's provision of catering services in connection with the offering for sale of Ludger's Bavarian Cakery products and services has caused and is likely to cause consumer confusion in the future as to the source or sponsorship of Ludger's Bavarian Cakery's products and services." (Cease and Desist Letter, Exhibit 7, p. 2).

(c)     "You [Sweet Appetit] have knowingly misrepresented that Ludger's Bavarian Cakery provides catering services as a part of your business in an effort to deceive the public and take advantage of the substantial goodwill that SGN has built since acquiring the LUDGER's CATERING trade names in 2009." (Cease and Desist Letter, Exhibit 7, p. 3).

20.     After Dickens received the cease and desist letter, she changed the word "Catering" on the Menu to "Bundles," i.e., "Breakfast and Lunch Bundles." However, the Menu order form

continued to refer to "breakfast catering." (Hearing Transcript, Dickens Testimony, Exhibit 4, 172: 4-23).

21.     SGN contends that it "has suffered significant damage as a result of Sweet Appetit's improper provision of catering in the form of loss of catering customers, confusion among existing catering customers, and damage to the goodwill that SGN has built in the LUDGER'S CATERING trade names." (DMS, Exhibit 2, p. 5, ¶ 13).

22.     SGN contends that "[s]ince SGN's December 7, 2018 Cease and Desist Letter, there has been significant confusion among potential SGN customers, including South Tulsa Pediatrics, who mistakenly attempted to use the Ludger's Bavarian Cakery website menu to place a luncheon order with LUDGER'S CATERING."(DMS, Exhibit 2, p. 5, ¶ 13).

23.     According to Sherrill, as of February 13, 2019, "[d]espite SGN's repeated demands therefore, Sweet Appetit continues to provide and advertise catering services in direct competition with SGN which continues to create significant confusion among customers of SGN and the community at large," and she is "aware that as recently as February 12, 2019, Sweet Appetit provided catering services to a group of more than sixty (60) persons at a Tulsa Regional Chamber Luncheon event held at the Tulsa Historical Society." (DMS, Exhibit 2, p. 5, ¶ 14).

## II.     THE UNDERLYING ACTION

24.     On February 14, 2019, SGN filed the Underlying Action against Sweet Appetit in the District Court of Tulsa County, Oklahoma. (Plaintiff's Original Petition, Exhibit 9).

25.     Also on February 14, 2019, SGN filed in the Underlying Action a Motion for Temporary and Permanent Injunction requesting "that the Court grant a temporary injunction ... barring Defendant Sweet Appetit from continuing to offer catering services and advertising therefor in connection with Ludger's Bavarian Cakery." (Plaintiff's Motion for Temporary and Permanent

Injunction, Exhibit 10, p. 8, ¶ 22). SGN also sought "a permanent injunction barring Defendant Sweet Appetit from offering services and advertising therefor in connection with Ludger's Bavarian Cakery." (Plaintiff's Motion for Temporary and Permanent Injunction, Exhibit 10, pp. 9-10, ¶ 28).

26.     An evidentiary hearing on SGN's Motion for Temporary Injunction was held on March 27th and 28th, 2019.

27.     On April 17, 2019, the Court entered an Order Granting SGN's Motion for Temporary Injunction. In its Order, the Court made the following findings of fact and conclusions of law:

1.)     The Plaintiff [SGN] executed a Purchase and Sale Agreement ("Agreement") on about October 29, 2019 with The Black Forest Café, Inc. ("Black Forest") (a corporation whose President was Ludger Schulz. Mr. Schulz executed the agreement on behalf of the seller – Black Forest).

2.)     Pursuant to the terms of the Agreement, specifically Article 2, Section 2.01, the Plaintiff purchased from Black Forest "the right to operate in perpetuity and exclusively the catering and private dining room establishment of Ludger's Catering." Black Forest sold this "exclusive right", Ludger's goodwill, trademarks and a covenant not to compete for $275,000.00 to the Plaintiff. Agreement, Article 2, Section 2.01 (b).

3.)     The Agreement defined "Ludger's Catering" as:

...Assets, Stock Inventory, and the business and goodwill of that portion of the business of seller doing business as (d/b/a) Ludger's Catering and Dining Room located at 6120 – A East 32nd Place, Tulsa, OK 74135, but specifically excluding that other portion of the business of Seller doing business as (d/b/a) "Ludger's Cakes."

(Emphasis added). Agreement, Article 1, Section 1.01 (1). The Court notes that the goodwill associated with the name "Ludger's" is and was significant.

4.)     The Agreement provided no definition of Seller's business identified as "Ludger's Cakes" except Section 1.01 (q) defines "Schulz" as "Ludger Schulz", "an individual and principal owner and operator of The Black Forest Café, Inc., and the business unit of Ludger's Cakes and/or Ludger's Bakery."

5.)     The distinction between Ludger's Catering and Ludger's Cakes and/or Ludger's Bakery, specifically what Ludger Schulz excluded from his sale to the

7

Plaintiff and retained for himself, is best described in the Agreement in wording found in the original (now expired) but still instructive non-compete provision, Section 2.07. That section of the Agreement placed a non-compete obligation on the Plaintiff as to Black Forest – that Plaintiff could "not own, operate, ...a business that competed with seller's Bavarian cream cake or wedding cakes within fifty (50) miles..." Section 2.07 also reserved to the Plaintiff the right to create, bake or sell any "bakery goods or dessert products not specifically retained by the Seller herein."

The distinction is also reflected in Exhibit "C" to the Agreement which details "sign criteria." Included in Exhibit "C" is a statement that the "parties hereto have agreed that existing signage will be changed if necessary to clearly demonstrate the separateness of the business operations of Ludger's Catering and Dining Room from Ludger's Cakes.

6.)    Testimony from Defendant's witness Allison Dickens established that the Defendant acquired Ludger's cake business in 2010, and opened a new location in 2013. Ludger's cakes is best known for its "Bavarian Cream Cheesecake". The new location included a coffee shop. At approximately the same time, the Defendant started offering savory items including a popular breakfast sandwich. However, the primary business of Ludger's cakes is in providing Danish, muffins, strudels and similar items.

7.)    In April 2015, the Plaintiff became aware that the Defendant was providing a "Catering Menu." The Plaintiff and Defendant exchanged a number of emails between April 8, 2015 and April 15, 2015 regarding the Plaintiff's assertion that the Defendant was catering and also concerns about the Defendant even offering savory items at all. Defendant acknowledged providing catering services to Walgreens during that time period on a few occasions and also acknowledged that their website was "confusing."

8.)    In late November, 2018, the Plaintiff again became aware that Defendant was offering a "Catering Menu." A cease and desist letter immediately followed. As of December 10, 2018, according to the testimony of Plaintiff's witness Megan Sherrill, the Defendant removed the words "Catering Menu" from its website but were still engaged in catering through offering breakfast and lunch bundles for large numbers. It appears the food services being provided were identical as those food services which previously had the heading "Catering Menu" and the current menu is headed "Breakfast" and "Lunch" "Bundles".

10.)    The Defendant engaged in catering services to the Tulsa Regional Chamber on February 12, 2019.

11.)    As a matter of law, the Court concludes that the language of the Agreement is clear as to what Ludger Schulz was selling to the Plaintiff in 2009 when he sold Ludger's Catering (and Dining Room). The Court further concludes that the

Agreement is clear as to what Ludger Schulz was reserving for himself as a "business unit." Ludger Schulz sold, for a substantial sum, the goodwill of the Ludger's Catering name, and the exclusive and perpetual right to operate Ludger's Catering. The language of the Agreement in this regard is clear and explicit, and as such, controls the interpretation of Section 2.01 of the Agreement. See title 15 O.S.2011, §§ 154, 155.

In interpreting a contract, the "whole of a contract is to be taken together, so as to give effect to every part ... each clause helping the interpret others." 15 O.S. 2011, § 157. Certainly, when taken as a whole, the Agreement is clear and explicit as to the "business units" Ludger Schulz was reserving when he sold Ludger's Catering to the Plaintiff, i.e., Ludger's Cakes, Ludger's Bakery, including but not limited to, Bavarian cream cheese cakes and wedding cakes. The foregoing clearly reflects the mutual intention of the parties to the Agreement.

12.)    The plain and ordinary meaning of the word "catering" can be found in its standard dictionary definition. Oxford English/Living Dictionaries defines catering as "the provision of food and drink at a social event or other gathering"; Collins English Dictionary defines catering as "the activity of providing food and drink for a large number of people, for example, at weddings and parties"; Cambridge Dictionary defines catering is (sic) the business of providing food and drink at events, for organizations.

While these definitions clearly define event-type catering, the question would remain as to the Defendant's breakfast and lunch bundles. Based on the foregoing definitions, if Defendant was to deliver its bundles, under the Ludger's name, to a remote event, it would be catering under the Ludger's name, regardless of any combination of words other than catering, such as cakery, bakery.

13.)    The evidence is clear that even the Defendant recognized per the 2015 email communications with the Plaintiff that it did not "push" its breakfast trays "because many of the suggested targets would be to advertise to pharmaceutical reps and other types of clientele that we know are a core part of your business."

The Defendant [Sweet Appetit] recognizes that this type of food service, providing meals, in essence, to large numbers of persons, even for pick up, as catering activity which, under the Ludger's name lies exclusively with Plaintiff. In contrast, providing bakery items, and even savory items, in house, to usual numbers of persons, would not be a catering activity.

(Order Granting Plaintiff's Motion for Temporary Injunction ("Injunction Order"), Exhibit 11, 4-17-

2019, pp. 1-3, ¶¶ 1-13).

28.    The Court held that Sweet Appetit's "coupling of the Ludger's Cakery name with

catering services would be an intentional act by Sweet Appetit to mislead the public." Specifically, the court held as follows:

> The evidence also supports that there has arisen significant confusion among ordinary buyers/customers since Defendant began providing catering services. This evidence includes going into one of the party's store because the customer believed it was the other party's store. The evidence also supports a probable finding that, when the Defendant provides catering services under the Ludger's name (whether it is in connection with the Cakery, Bakery, Coffee House or other common wording used in conjunction with the Ludger's name), the Defendant is in competition with the Plaintiff. Further, even where Defendant's name, Ludger's Bavarian Cakery, is not objectionable as unfair competition with the Plaintiff, the evidence supports a probable finding that the coupling of the Ludger's Cakery name with catering services (overt acts of Defendant), would be an intentional act by the Defendant to mislead the public.
>
> Based on the foregoing, the Court finds that Plaintiff has adequately shown that it would likely succeed on the merits as the deceptive trade practices claim.

(Injunction Order, Exhibit 11, p. 6).

29.     On May 29, 2019, SGN filed a Second Amended Petition ("SAP") in the Underlying Action. In its SAP, SGN seeks to recover from Sweet Appetit under the following Counts:

- •     Count I–Tortious Interference with Existing and Prospective Business Relationships;
- •     Count II–Violation of Oklahoma Deceptive Trade Practice Act; and
- •     Count III–Permanent Injunction.

(SAP, Exhibit 12, pp. 13-16).

30.     Under Count I–Tortious Interference with Existing and Prospective Business Relationships, SGN seeks the following damages: "SGN seeks an accounting from the Defendants of all income from catering services received since September 9, 2010. SGN further requests that the Court order the Defendants to disgorge all profits received from offering catering since September 9, 2010." (SAP, Exhibit 12, p. 14, ¶ 80).

31.     Under Count II–Violation of Oklahoma Deceptive Trade Practice Act, 78 Okla. Stat.

tit. 51 *et seq*., SGN seeks the following damages: "an award of damages authorized by 78 Okla. Stat.

§ 54 for damage to SGN's reputation and loss of existing and potential catering customers." (SAP,

Exhibit 12, p. 15, ¶ 89).

32.     Under Count III–Permanent Injunction, SGN seeks equitable relief in the form of a

permanent injunction. (SAP, Exhibit 12, p. 16, ¶ 102).

### III.     THE STATE FARM POLICIES ISSUED TO SWEET APPETIT

33.     From September 15, 2011 to August 29, 2017, State Farm insured Sweet Appetit

under Policy Number 96-BL-R081-7. From August 29, 2017 to present, State Farm insured Sweet

Appetit under Policy Number 96-BS-E946-7.

34.     Both Policies contain the same Businessowners Coverage Form, Form CMP-4100.

(**Policy Number 96-BL-R081-7**, State Farm Businessowners Coverage Form, Dkt. # 5-1, pp. 19-58,

Dkt. # 5-2, pp. 23-62, Dkt. # 5-3, pp. 25-64, Dkt. # 5-4, pp. 14-53, Dkt. # 5-5, pp. 14-53, Dkt. # 5-6,

pp. 26-65; **Policy Number 96-BS-E946-7**, State Farm Businessowners Coverage Form, Dkt. # 5-7,

pp. 113-152, Dkt. # 5-8, pp. 127-166, Dkt. # 5-9, pp. 10-49).[1]

35.     Subject to their terms and conditions, the Policies extend coverage to "bodily injury"

or "property damage" caused by an "occurrence," and to "'personal and advertising injury' caused

by an offense arising out of your business.'" (Businessowners Coverage Form CMP-4100, Exhibit

13, p. 23).

As more fully addressed herein, the Policies do not provide coverage for the damages SGN

---

[1]  For clarity and simplicity in citation to Businessowners Coverage Form CMP-4100, State Farm has filed Form CMP-4100 as separate Exhibit 13 to this Brief. This was done in order to avoid citation to Form CMP-4100 as part of each of the Policies for the multiple policy periods involved. The complete certified Policies were filed of record in this action with State Farm's Amended Complaint. The Policies are designated as Dkt. # 5-1 through Dkt. # 5-9. Businessowners Coverage Form CMP-4100 is set forth with each of the Policies at the docket number set forth in Undisputed Fact No. 34 herein.

seeks to recover from Sweet Appetit and do not provide coverage for the claims asserted by SGN against Sweet Appetit in the Underlying Action.

## ARGUMENT AND AUTHORITIES

### I.       SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548 (1986). "In essence, the inquiry for the Court is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one must prevail as a matter of law.'" *Boggs v. Great N. Ins. Co*., 659 F. Supp. 2d 1199, 1204 (N.D. Okla. 2009).

### II.      INSURANCE CONTRACT CONSTRUCTION

"Under Oklahoma law, the interpretation of insurance contracts is 'a matter of law for the Court to determine ....'" *Yousuf v. Cohlmia*, 741 F.3d 31, (10th Cir. 2014) (quoting *Dodson v. St. Paul Ins. Co*., 812 P.2d 372, 376 (Okla. 1991)). "Parties may contract for risk coverage at will and are bound by the policy terms to which they agree." *Yousuf v. Cohmia*, 718 F. Supp. 2d 1279, 1285 (N.D. Okla. 2010) (citing *Dodson*, 812 P.2d at 376). "The construction of an insurance policy should be a natural and reasonable one, fairly constructed to effectuate its purpose." *Id*. (quoting *Wiley v. Travelers Ins. Co*., 534 P.2d 1293, 1295 (Okla. 1974)). "[N]either forced nor strained construction will be indulged, nor will any provision be taken out of context...." *Dodson*, 812 P.2d at 376. "Coverage does not turn on the legal theory under which liability is asserted, but on the cause of the injury." *Farmers Alliance Mut. Ins. Co. v. Willingham*, 2009 WL 3429768, *4 (N.D. Okla. 2009);

*Zurich Am. Ins. Co. v. Good To Go, LLC*, 2018 WL 8333413, *8 (W.D. Okla. 2018). Courts are not at liberty to rewrite the policy for the parties where it is otherwise unambiguous. *Am. Econ. Ins. Co. v. Bogdahn*, 89 P.3d 1051, 1054 (Okla. 2004).

## III.   THE INSURANCE POLICIES

### A.   The Extension of Coverage

The first step in coverage analysis is to determine if the insuring agreement in the policy extends coverage to the damages sought to be recovered from the insured. If coverage is extended, the next step is to determine if policy exclusions apply, thereby negating coverage. *Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 627 (9th Cir. 1996); *Dodson.*, 812 P.2d at 377. "The insured has the burden of showing that its claim is covered under the policy." *Boggs*, 659 F. Supp. 2d at 1204. "Once the insured establishes coverage, 'the insurer has the burden of showing that a loss falls within an exclusionary clause of the policy.'" *Id.* (quoting *Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000)).

Subject to their terms and conditions, the Policies extend coverage to "bodily injury" or "property damage" caused by an "occurrence," and to "'personal and advertising injury' caused by an offense arising out of your business." Specifically, the coverage extension clause in the Policies provides in relevant part as follows:

---

**Coverage L – Business Liability**

1.   When a Limit Of Insurance is shown in the Declarations for **Coverage L – Business Liability**, we will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies....

***

2.   This insurance applies:

13

      **a.**     To "bodily injury" and "property damage" only if:

         **(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

         **(2)**    The "bodily injury" or "property damage" occurs during the policy period;

***

      **b.**     To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

(Businessowners Coverage Form CMP-4100, Exhibit 13, p. 23, ¶¶ 1., 2. a. (1) (2), 2. b.). The

Policies define the term "bodily injury" as follows:

      **3.**     "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting any of these at any time. "Bodily injury" includes mental anguish or other mental injury caused by the "bodily injury."

(Businessowners Coverage Form CMP-4100, Exhibit 13, p. 34, ¶ 3). The Policies define the term

"property damage" in relevant part as follows:

      **21.**    "Property damage" means:

         **a.**     Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

(Businessowners Coverage Form CMP-4100, Exhibit 13, p. 36, ¶ 21).

      *1.*     *SGN Does not Seek to Recover From Sweet Appetit for "Bodily Injury" or "Property Damage"*

SGN's SAP consists of one hundred and thirty-three (133) paragraphs. (SAP, Exhibit 12, pp.

1-21). No where in its SAP does SGN seek to recover from Sweet Appetit for bodily injury, sickness,

disease, or death, or for physical injury to tangible property. Instead, "SGN seeks an accounting from

the Defendants of all income from catering services received since September 9, 2010. SGN further

requests that the Court order the Defendants to disgorge all profits received from offering catering

14

since September 9, 2010." (SAP, Exhibit 12, p. 14, ¶ 80). SGN also seeks "an award of damages authorized by 78 Okla. Stat. § 54 for damage to SGN's reputation and loss of existing and potential catering customers." (SAP, Exhibit 12, p. 15, ¶ 89). Section 54 allows monetary damages for a deceptive trade practice. Okla. Stat. 78, § 54(A).

This Court construed an identical definition of "property damage'' in *Boggs*, *supra.* This Court recognized that "[t]he Underlying Claims in this case are 'economic or pecuniary in nature,' and are ... not property damage under the Insurance Policies." *Boggs*, 659 F.Supp.2d at 1209. Likewise, in construing that same definition, the Tenth Circuit has recognized that money is not "tangible property." *Mullin v. Travelers Indem. Co. of Conn.*, 541 F.3d 1219, 1223 (10th Cir. 2008). The *Mullin* court cited numerous cases recognizing that currency, investments, and bank account funds are not "tangible property." *Id.* Here, as in the foregoing cases, SGN's monetary and pecuniary damages do not constitute "property damage" within the meaning of that term in the Policies. Accordingly, the damages SGN seeks to recover from Sweet Appetit do not constitute "bodily injury" or "property damage" within the meaning of those terms in the Policies.

2.  *SGN's Claims Against Sweet Appetit are not for "Bodily Injury" or "Property Damage" Caused by "Occurrence"*

Because SGN does not seek to recover from Sweet Appetit for bodily injury or property damage as those terms are defined in the Policies, coverage analysis relating to such damages is at an end because coverage does not extend in the first instance. In the alternative, even if SGN sought to recover for bodily injury or property damage, coverage extends only when such damages are "caused by an 'occurrence.'" (Businessowners Coverage Form CMP-4100, Exhibit 13, p. 23, ¶¶ 1., 2. a. (1) (2), 2. b.).

The Policies define the term "occurrence" as follows: "'Occurrence' means an accident,

including continuous or repeated exposure to substantially the same general harmful conditions." (Businessowners Coverage Form CMP-4100, Exhibit 13, p. 36, ¶ 17). Under Oklahoma law, an "accident" is "[a]n event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event, chance, contingency." *United States Fid. & Guar. Co. v. Briscoe*, 239 P.2d 754, 757 (Okla. 1951). The *Briscoe* court defined the term "accidental" as "happening by chance or unexpectedly, undesigned, unintentional; unforseen, or unpremeditated." *Id.*

SGN does not allege damages that happened by chance or that arose from any sudden, unexpected, unintended, event, chance, or contingency. The words "accident" or "accidental" appear nowhere in the 133 paragraphs set forth in SGN's SAP. (SAP, Exhibit 12, pp. 1-23). Nor do the words "negligent" or "negligence" appear in the SAP. Instead, SGN seeks to recover monetary damages for alleged economic loss resulting from Sweet Appetit's catering services and for equitable relief in the form of injunctions.[2] (SAP, Exhibit 12, p. 14, ¶ 80, p. 15, ¶ 89). As such, SGN has not sued Sweet Appetit for bodily injury or property damage caused by an "occurrence," and therefore the Policies do not extend coverage.

3.     *SGN Does not Seek to Recover From Sweet Appetit for "Personal and Advertising Injury"*

Subject to their terms and conditions, the Policies extend coverage to "'personal and

---

[2] Equitable relief is not damages covered by the Policies. *See State Farm Fire & Cas. Co. v. Metro. Mgmt.*, 2007 WL 4157148, *11 (D. Haw. August 29, 2007) ("Equitable relief, in the form of injunction or otherwise, does not constitute 'damages' within the meaning of an insurance policy providing liability coverage."); *Elett Bros., Inc. v. U.S. Fid. & Guar. Co.*, 275 F.3d 384 (4th Cir. 2001) (held no duty to defend under CGL policy for suit seeking injunctive relief, restitution, and disgorgement profits); *Jones v. Farm Bureau Mut. Ins. Co.*, 431 N.W.2d 242, 245 (Mich. App. 1988) (insurer under farm owner's policy had no duty to defend insured in underlying nuisance action seeking only mandatory injunction); *Hunter v. Hirsig*, 614 Fed. Appx. 960, 963 (10th Cir. 2015) ("[T]he Court has drawn an important 'distinction between an action at law for damages–which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation–and an equitable action for specific relief.'").

advertising injury' caused by an offense arising out of your business." The Policies define the term

"personal and advertising injury" as follows:

> **18.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
>
> **a.** False arrest, detention or imprisonment;
>
> **b.** Malicious prosecution;
>
> **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of privacy, of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
>
> **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> **e.** Oral or written publication, in any manner of material that violates a person's right to privacy;
>
> **f.** The use of another's advertising idea in your "advertisement", or
>
> **g.** infringing upon another's copyright, trade dress or slogan in your "advertisement."

(Businessowners Coverage Form CMP-4100, Exhibit 13, p. 36, ¶ 18). Effective April 9, 2018, Policy

Number 96-BS-E946-7 was amended to include Policy Endorsement CMP-4561.1.[3] That

endorsement modified the Policy definition of "personal and advertising injury" in relevant part as

follows:

---

**CMP-4561.1 POLICY ENDORSEMENT**

This endorsement modifies insurance provided under the following:
BUSINESSOWNERS COVERAGE FORM

---

[3] *See* Declarations Amended April 9, 2018, Dkt. # 5-7, p. 73, Forms and Endorsements, Dkt. # 5-7, p. 79; CMP-4561-1 Policy Endorsement, Dkt. # 5-7, pp. 85-89; Dkt. # 5-8, pp. 82-86; Dkt. # 5-9, pp. 70-74). For simplicity, CMP-4561.1 Policy Endorsement is also attached as Exhibit No. 14.

\*\*\*

e.    **SECTION II – DEFINITIONS** is amended as follows:

\*\*\*

(3)    Paragraphs **18.f** and **g.** of "personal and advertising injury" are replaced by the follows:

f.    The use of another's advertising idea in your "advertisement";

g.    Infringing upon another's trade dress[4] or slogan in your "advertisement", or

h.    Infringement of another's copyright, patent, trademark, or trade secret.

(Policy Number 96-BS-E946-7, CMP-4561.1 Policy Endorsement, Exhibit 14, pp. 4-5, ¶ e. (3)).

Personal and advertising injury coverage is offense based coverage available when the insured has been sued for one or more of the enumerated offenses listed in the policy. *See Hanover Am. Ins. Co. v. Saul*, 2013 WL 4542284, \*6 (W. D. Okla.  2013) ("Because Balfour [insured] was not sued for one of the enumerated offenses, she is not entitled to either a defense or indemnification under the policy."); *Hinkle v. State Farm Fire & Cas. Co*., 308 P.3d 1009, 1014 (N. M. App. 2013) ("In this context, Hinkle, as the policyholder, could not have reasonably expected a defense to be provided for a suit based on a cause of action not enumerated under the Policy.").

Here, SGN has sued Sweet Appetit for Count I–Tortious Interference with Existing and Prospective Business Relationships (SAP, Exhibit 12, p. 13); Count II–Violation of Oklahoma Deceptive Trade Practice Act (SAP, Exhibit 12, p. 14); and Count III–Permanent Injunction. (SAP, Exhibit 12, p. 15). Those offenses are not enumerated within the definition of "personal and

---

[4] "Trade dress" is the "[t]he overall appearance and image in the marketplace of a product or commercial enterprise. For a product, trade dress typically comprises packaging and labeling. For an enterprise, it typically comprises design and decor." BLACK'S LAW DICTIONARY 1500 (7th ed. 1979). SGN's SAP is devoid of any claim that Sweet Appetit, through advertisement,  infringed on the appearance of SGN's products or the design/decor of SGN's business.

advertising injury." Accordingly, the personal and advertising injury coverage provided by the Policies does not extend to the offenses asserted by SGN against Sweet Appetit.[5]

### B.    Policy Exclusions

1.    *The Exclusion for the Unauthorized Use of Another's Name and  for Tactics That Mislead Another's Potential Customers*

"[U]nder Oklahoma law, 'policy exclusions are read seriatim; each exclusion eliminates coverage and operates independently against the general declaration of insurance coverage and all prior exclusions by specifying other occurrences not covered by the policy.'" *Above It All Roofing & Constr., Inc. v. Sec. Nat'l Ins. Co*., 285 F. Supp. 3d 1224, 1238 (N.D. Okla. 2018), quoting *Dodson*, 812 P.2d at 377. "Thus, each policy exclusion separately removes coverage." *Id*., citing *BP America, Inc. v. State Auto Prop. & Cas. Ins. Co*., 148 P.3d 832, 842 (Okla. 2005) ("Each exclusion eliminates coverage.").

The Policies exclude coverage for personal and advertising injury resulting from the unauthorized use of another's name and for injury arising from other tactics that mislead another's customers. Specifically, the unauthorized use exclusion provides as follows:

---

### Section II – Exclusions

Applicable to **Coverage L – Business Liability**, this insurance does not apply to:

***

### 17.    Personal And Advertising injury

---

[5] In addition to actual damages, SGN seeks to recover from Sweet Appetit "[p]unitive damages for the Defendants' intentional malicious and deceptive actions." (SAP, Exhibit 10, p. 20). Punitive damages are not damages for "bodily injury" or "property damage" caused by an "occurrence," and do not constitute "personal and advertising injury." Even if the Policies extended coverage to such damages, Oklahoma public policy does not allow a defendant to escape liability for exemplary or punitive damages by shifting the loss to an insurer. *See Dayton Hudson Corp. v. Am. Mut. Liab. Ins.*, 621 P.2d 1155, 1160 (Okla. 1980).

19

      **m.**    Arising out of the unauthorized use of another's name or product in
your e-mail address, domain name or metatags, or any other similar
tactics to mislead another's potential customers;

(Businessowners Coverage Form CMP-4100, Exhibit 13, p. 28, ¶ 17 m.).

      Sweet Appetit linked "catering" with the Ludger's name through its website Menu which

identified its business as "**LUDGER'S** Bavarian Cakery" and, on that same page, included its

"**CATERING MENU**." (Ludger's Bavarian Cakery Menu, Exhibit 6; Hearing Transcript, Dickens

Testimony, Exhibit 4, p. 171:16-23). The LUDGER'S name and catering also appeared on Sweet

Appetit's website domain name or metatag, i.e., "https://ludgersbavariancakery.com/pages/menus/

**catering**-menu." *Id*. (emphasis added) (Menu, Exhibit 6). The LUDGER'S name was also used in

Sweet Appetit's email address; www.ludgersbavariancakery.com." (Email 4-15-2015, Exhibit 5, p.

2). Thus, Sweet Appetit was using the name "Ludger's" in its website, e-mail address, and domain

name or metatags. As recognized by the court in the Underlying Action, that use was unauthorized

when coupled with catering services. (Injunction Order, Exhibit 11, p. 6, ¶ 4) ("[t]he evidence

supports a probable finding that the coupling of the Ludger's Cakery name with catering services

(overt acts of Defendants), would be an intentional act by the Defendant to mislead the public."). *Id*.

      The unauthorized use exclusion also applies to "any other similar tactics to mislead another's

potential customers." The Court in the Underlying Action held that the activities of Sweet Appetit

in offering catering coupled with the Ludger's name would mislead the public:

> Further, even where Defendant's name, Ludger's Bavarian Cakery, is not
> objectionable as unfair competition with the Plaintiff, the evidence supports a
> probable finding that the coupling of the Ludger's Cakery name with catering
> services (overt acts of Defendant), would be an intentional act by the Defendant to
> mislead the public.

(Injunction Order, Exhibit 11, p. 6, ¶ 4).  In her email dated April 15, 2015, the owner of Sweet

Appetit, Allison Dickens, acknowledged that "[i]n hindsight, I can see your point about our use of

the word catering for information on our website," and stated she would "address the confusion" with the customer. (Email 4-15-2015, Dickens to Sherrill, Exhibit 5, p. 2). The court in the Underlying Action made findings of fact concerning the confusion. Specifically, the court found that "Defendant [Sweet Appetit] acknowledged providing catering services to Walgreens during that time period on a few occasions and also acknowledged that their website was 'confusing.'" (Injunction Order, Exhibit 11, p. 2, ¶ 7). Thus, even if SGN sought to recover for claims enumerated as personal and advertising injury (which it does not), Exclusion 17 m. would apply, thereby negating coverage.

Exclusion 17 m. was addressed by the court in *State Farm Fire and Casualty Co. v. Prescott*, 2019 WL 1840906 (Haw. 2019). In *Prescott*, State Farm issued a businessowners policy to Joan Prescott who owned a bed and breakfast in Hawaii. Prescott began using the name "Volcano Inn" for her bed and breakfast. *Id*. at *1. That name, however, was the trade name of a competitor bed and breakfast owned by Ronald Ober. *Id.*  Ober sued Prescott for infringement, conversion, theft of trade name, constructive trust, interference with prospective economic advantage, unfair and deceptive competition and business practices, and intentional and/or negligent infliction of emotional distress. *Id*. at **1-2. Prescott sought defense and indemnity from State Farm.

State Farm filed a declaratory judgment action seeking a ruling that the policy did not provide defense or indemnity coverages. State Farm filed a motion for summary judgment, arguing that the identical exclusion at issue herein, Exclusion 17 m., applied and therefor negated coverage. *Id*. at *4. The court agreed, holding as follows:

> Exclusion 17.m excludes coverage from any personal and advertising injury "[a]rising out of the unauthorized use of another's name or product in [the insured's] e-mail address, domain name or metatags, or any other similar tactics to mislead another's potential customers." The Underlying Suit claims damages caused by Prescott's unauthorized use of the name "Volcano Inn" in her domain name, internet listings, and advertising, which allegedly tricked consumers into booking reservations at her bed and breakfast instead of Ober's. Although the exclusion only explicitly

mentions use of another's name in the insured's email address, domain name, or metatags, the Policy also excludes "any other similar tactics to mislead another's potential customers." There is no dispute that Plaintiff's alleged use of "Volcano Inn" in internet listings and advertisements amounts to such a similar tactic. Thus, the plain terms of the Policy clearly exclude the allegations in the Underlying Suit that Prescott used Ober's trade name not only in her domain name, but also in her internet listings and advertisements.

It does not matter that the Underlying Suit pleads different causes of action because they arise from the same behavior. *See Bayudan v. Tradewind Ins. Co., Ltd.*, 87 Haw. 379, 387 (Ct. App. 1998) (holding that "the mere recasting" of underlying injurious conduct "under various counts" does not change whether the underlying injurious conduct is covered by the policy). Here, the factual support for Counts I through VII is the same: that Prescott used Ober's trade name in her domain name, internet listings, and advertisements.

*Id*. at *4.

Oklahoma, like Hawaii, recognizes that "[c]overage does not turn on the legal theory under which liability is asserted, but on the cause of the injury." *See Farmers Mut. Ins. Co. v. Willingham,* 2009 WL 3429768, *4 (N.D. Okla. 2009), quoting *Phillips v. Greenfield,* 859 P.2d 1101, 1105 (Okla. 1993). Here, the cause of the injury alleged by SGN is Sweet Appetit's unauthorized use of the "'Ludger's" name in conjunction with catering on its website and in misleading the public and SGN's customers through the coupling the name "Ludger's" and catering with Sweet Appetit's d/b/a Ludger's Bavarian Cakery. Thus, even if SGN sought to recover for claims enumerated as personal and advertising injury (which it does not), exclusion 17 m. applies, thereby negating coverage.

2. *The Exclusion for acts Known to Inflict "Personal and Advertising Injury"*

Because exclusion 17 m. eliminates coverage, there is no need to address other exclusions. S*ee BP America,* 148 P.3d at 842. In the alternative, the Policies contain the following exclusion for personal and advertising injury caused at the direction of the insured with knowledge that the act would cause personal and advertising injury:

---
**Section II – Exclusions**

---

Applicable to **Coverage L – Business Liability**, this insurance does not apply to:

***

**17.     Personal And Advertising injury**

      **a.**      Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

(Businessowners Coverage Form CMP-4100, Exhibit 13, p. 28, ¶ 17 a.).

Courts frequently resort to standard dictionaries for the plain and ordinary meaning of insurance contract terms. *See Webb v. Allstate Life Ins. Co*., 536 F.2d 336 (10th Cir. 1976); *Hurst v. Nationwide Mut. Ins. Co*., 2020 WL 2988688, *3 (10th Cir. June 4, 2020). Webster's dictionary defines "knowledge" as "the fact or condition of being cognizant, conscious, or aware of something." Webster's Third New International Dictionary, 1252 (2002).

Allison Dickens of Sweet Appetit was certainly "aware" that the providing of catering services would violate the rights of SGN. Dickens testified at the TRO hearing that when she purchased Ludger's Cakery from her stepfather, Ludger Schulz, she was aware that he had sold the catering side of the business to SGN. (Hearing Transcript, Dickens Testimony, Exhibit 4, 164:19-24). The court in the Underlying Action found that Sweet Appetit recognized that providing meals to large numbers of persons lied exclusively with SGN:

    13.)     The evidence is clear that even the Defendant recognized per the 2015 email communications with the Plaintiff that it did not "push" its breakfast trays "because many of the suggested targets would be to advertise to pharmaceutical reps and other types of clientele that we know are a core part of your [SGN's] business."

    The Defendant [Sweet Appetit] recognizes that this type of food service, providing meals, in essence, to large numbers of persons, even for pick up, as catering activity which, under the Ludger's name lies exclusively with Plaintiff [SGN]. In contrast, providing bakery items, and even savory items, in house, to usual

23

numbers of persons, would not be a catering activity.

(Injunction Order, Exhibit 11, p. 3, ¶ 13) (brackets added).

Despite that knowledge, Sweet Appetit d/b/a Ludger's Bavarian Cakery, offered a "Catering Menu" on its website. (Hearing Transcript, Dickens Testimony, Exhibit 4, 171:10-23; Menu, Exhibit 6). After receipt of the cease and desist letter dated December 7, 2018, Dickens removed the word "Catering" from the Menu. (Hearing Transcript, Dickens Testimony, Exhibit 4, 172:4-18). Thus, even if SGN sought to recover for claims enumerated as personal and advertising injury (which it does not), Sweet Appetit, the insured, had "knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" (Businessowners Coverage Form CMP-4100, Exhibit 13, p. 28, ¶ 17 a.). Accordingly, Exclusion 17 a. would apply, thereby negating coverage.

3. *Exclusion for Trademark Infringement*

Because exclusions 17 m. and 17 a. eliminate coverage, there is no need to address other exclusions. S*ee BP America,* 148 P.3d at 842. In the alternative, even if SGN's claims included a claim for trademark infringement (which is not set forth in the SAP), the definition of "Personal and Advertising Injury" prior to the amendment of April 9, 2018, did not include trademark infringement (*see* pp. 17-18 herein), and the Policies contained the following exclusion for trademark infringement:

---

**Section II – Exclusions**

Applicable to **Coverage L – Business Liability**, this insurance does not apply to:

\*\*\*

**17.    Personal And Advertising injury**

\*\*\*

 **l.** Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such

other intellectual property rights do not include the use of another's advertisement idea in your "advertisement." However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan;

(Businessowners Coverage Form CMP-4100, Exhibit 13, p. 28, ¶ 17 l.).

### C.    The Duty to Defend

The Policies provide for defense if an insured has been sued for damages "to which the insurance applies," and that "we [State Farm] will have no duty to defend the insured against any 'suit' seeking damages ... to which this insurance does not apply." (Businessowners Coverage Form CMP-4100, Exhibit 13, p. 23).  Thus, State Farm has a duty to defend only when an insured has been sued covered damages.  Consistent therewith, "under Oklahoma law, a liability insurer is not obligated to defend an action against its insured where the insurer would not be liable under its policy for any recovery in such suit." *Mass. Bay Ins. Co. v. Gordon,* 708 F.Supp. 1232, 1234 (W.D. Okla. 1989); *Scottsdale Ins. Co. v. Owl Nite Sec., Inc.*, 2006 WL 3742102, *4 (N.D. Okla. Dec. 15, 2006). For the reasons set forth herein, there exists no possibility of coverage under the Policies for the claims made by SGN against Sweet Appetit in the Underlying Action. Accordingly, State Farm has no duty to continue the defense of Sweet Appetit in the Underlying Action.

### CONCLUSION

For the reasons set forth herein, State Farm requests summary judgment finding that the Policies do not provide coverage for the damages SGN seeks to recover from Sweet Appetit in the Underlying action, and therefore: (1) State Farm has no duty to indemnify Sweet Appetit for liability it may incur in the Underlying Action; (2) State Farm has no duty to continue to defend Sweet Appetit in the Underlying Action; and (3)  State Farm has no duty to satisfy any judgment that may be entered in favor of SGN and against Sweet Appetit in the Underlying Action.

25

Respectfully submitted,

**ATKINSON, HASKINS, NELLIS,**
**BRITTINGHAM, GLADD & FIASCO**
A PROFESSIONAL CORPORATION


_____/s/ Galen L. Brittingham_____
Galen L. Brittingham, OBA #12226
James N. Edmonds, OBA #15757
Wynoka Middleton McClellan, OBA #32833
1500 ParkCentre, 525 South Main
Tulsa, OK 74103-4524
Telephone:  (918) 582-8877
Facsimile:  (918) 585-8096
*Counsel for Plaintiff, State Farm Fire &*
*Casualty Company*

## CERTIFICATE OF SERVICE

I hereby certify that on August 7th, 2020, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

William Gregory James, OBA #4620
Sharon K Weaver, OBA #19010
Thomas Martin Askew, OBA #13568
**Riggs Abney Neal Turpen Orbison & Lewis (Tulsa)**
502 W 6TH ST
TULSA, OK 74119-1010
918-587-3161
Fax: 918-587-9708
Email: gjames@riggsabney.com
Email: sweaver@riggsabney.com
Email: taskew@riggsabney.com
**Counsel for Defendant, Sweet Appetit, Inc.**

Robert J Winter, OBA #16754
**Pray Walker PC**
100 W 5TH ST STE 900
TULSA, OK 74103-4292
918-581-5500
Fax: 918-581-5599
Email: rwinter@praywalker.com
**Counsel for Defendant, Ludger Schulz**

26

Christopher D. Wolek, OBA #19612
Michael P. Womack, OBA #20895
Matthew B. Covert, OBA #31970
**Mullican & Hart, P.C.**
15 E. Fifth Street, Ste. 2200
Tulsa, Oklahoma 74103
(918) 794-6500 (Office)
(918) 728-7324 (Direct)
(918) 794-6068 (Fax)
Email: cwolek@mullicanhart.com
Email: mwomack@mullicanhart.com
Email: mcovert@mullicanhart.com
**Counsel for Defendant, SGN Foods, LLC**

/s/ Galen L. Brittingham

S:\Files\441\63\SWEET-MSJ-8-7-2020-GLB.wpd